# United States Court of Appeals
## For the First Circuit

Nos. 04-2614; 04-2615

MIGUEL ARRIETA-COLON; NEREIDA OLIVENCIA-BADILLO;
CONJUGAL PARTNERSHIP ARRIETA-OLIVENCIA,

Plaintiffs, Appellees/Cross-Appellants,

v.

WAL-MART PUERTO RICO, INC. a/k/a WAL-MART STORE 1854,

Defendant, Appellant/Cross-Appellee.


WAL-MART STORES, INC.; BENJAMIN GOMEZ; JANE ROE 00CV1772;
CONJUGAL PARTNERSHIP GOMEZ-ROE; MARA MIELES; ROBERT ROE 00CV1772;
CONJUGAL PARTNERSHIP MIELES-ROE; JOSE MERCADO; JULIE DOE
00CV1772; CONJUGAL PARTNERSHIP MERCADO-BOSQUES; JOSE RAMOS;
ROBERTA DOE 00CV1772; CONJUGAL PARTNERSHIP RAMOS-DOE; A-Z INS.
CO.; WAL-MART ASSOC., INC.,

Defendants.


APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]


Before

Boudin, Chief Judge,
Lynch, Circuit Judge,
and Gorton[*], District Judge.


[*] Of the District of Massachusetts, sitting by designation.

Rubén T. Nigaglioni, with whom Veronica Ferraiuoli, Rafael J. Martínez, and Nigaglioni & Ferraiuoli Law Offices P.S.C. were on brief, for Wal-Mart Puerto Rico, Inc.

Mireya Baltazar-Suazo, with whom Orlando I. Martínez-García, Nora Vargas-Acosta, and Abogados de América Law Offices, were on brief, for Arrieta-Colon et al.

————————————

January 13, 2006

————————————

**LYNCH**, **Circuit Judge**.  A jury awarded Miguel Arrieta-Colon $76,000 in compensatory damages and $160,000 in punitive damages against Wal-Mart Puerto Rico, Inc. ("Wal-Mart") on his disability discrimination claim under the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213.

Specifically, the jury found Arrieta had proven that he had an impairment or was regarded as having an impairment which substantially limited his ability to perform a major life function. Arrieta's claimed impairment was a penile implant used to correct a sexual dysfunction: the implant itself left Arrieta with the appearance of a constant semi-erection.  The jury also found that Arrieta was subjected to a hostile work environment because of his disability.  Arrieta's claim was that, due to his condition, he was constantly harassed both by his supervisors and co-workers, and that when he complained to his supervisors, no corrective actions were taken.  The jury found that Arrieta was constructively discharged; that is, that he resigned from Wal-Mart due to the intolerable working conditions.

Wal-Mart appeals from the verdict, arguing that the district court erred in failing to instruct the jury on an affirmative defense under Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), and Faragher v. City of Boca Raton, 524 U.S. 775 (1998).  Wal-Mart also makes two insufficiency of the evidence arguments as to liability: (1) that Arrieta was not disabled within

-2-

the meaning of the ADA, in that his impairment neither affected a major life activity nor was related to working conditions; and (2) that the evidence was insufficient to support the existence of a hostile work environment. Of these, the most difficult issue is that of whether Arrieta was disabled within the meaning of the ADA. But Wal-Mart did not preserve the issue at trial and does not demonstrate circumstances that would warrant our taking the extraordinary step of reaching the merits of that issue on appeal.

Wal-Mart also challenges the damages award, arguing (1) that the district court erred in its punitive damages instruction to the jury, (2) that there was insufficient evidence for the jury to award punitive damages, and (3) that Arrieta failed to mitigate his damages by taking advantage of Wal-Mart's open door policy.

Arrieta, in turn, appeals,[1] arguing that the district court erred in denying his post-verdict motion seeking an additional award of back pay and front pay, adjudicated by the judge, not the jury.

In the end, we affirm on both appeals, leaving all parties in the place the jury and the district court left them.

---

[1] The jury also concluded that Wal-Mart had not violated Law 44 of July 2, 1995, P.R. Laws Ann. tit. 1, §§ 501 et seq., the Puerto Rico analogue to the federal ADA claim. Arrieta has not appealed this determination.

We recount the facts in the light most favorable to upholding the jury verdict as to the sufficiency challenge. Torres-Rivera v. O'Neill-Cancel, 406 F.3d 43, 45 (1st Cir. 2005).

Arrieta began working at Wal-Mart in 1992. At the time, he suffered from Peyronie's Disease, which made it impossible for him to have sexual intercourse. Arrieta had undergone unsuccessful surgery in 1992 to attempt to correct the problem. In February 1994 Arrieta underwent another surgery, during which the first implant was removed and a new penile prosthesis was implanted. The second procedure was successful, but had the side effect, common with this procedure, that Arrieta had a constant semi-erection that was apparent through his clothing. His doctor reported that Arrieta had no physical or mental impairment before going back to work. The complaints of harassment in this case concern the period after the February 1994 surgery.

Arrieta filed paperwork with Wal-Mart's personnel department detailing the February 1994 procedure in order to obtain approval for medical coverage. Soon after returning to work after the surgery, Arrieta became the subject of harassment by his co-workers and supervisors. Three co-workers, the plaintiff, and supervisors all described the numerous incidents. On his first day back at work, Jorge Ortiz, an assistant manager, asked Arrieta "how

it felt to have [his] new pump."[2]  When Arrieta confronted Ortiz about where he got the information, the assistant manager told him that he learned about Arrieta's surgery from the "girls in personnel."  Arrieta complained to Mara Mieles, the personnel manager, about the release of information and the fact that Ortiz had taunted him about it, but Mieles said, "I don't know what you're talking about, this is nonsense between guys, these are things between men."

Arrieta married his present wife on June 18, 1995.  The taunting about Arrieta's surgery continued for the remaining years that Arrieta worked at Wal-Mart, and was constant.  On the one hand, much of the harassment expressed the view that Arrieta was impotent, and that he needed to use a pump to get an erection.  One of Arrieta's co-workers testified that he thought Arrieta was impotent "[b]ecause according to what I know, a person who has had a little pump put in is because they are disabled as far as achieving an erection."  Another co-worker testified that the jokes were "regarding his age, saying that he needed to have a pump in order to have relations . . . . What they almost always used was the part regarding the pump, that he needed to use a pump."

On the other hand, some harassing statements evidenced an impression that Arrieta was unusually enabled because of the

_____

[2] In fact, Arrieta did not have a "pump," but rather had a flexible implant.  Eventually, his wife sewed special underwear which made the abnormality less visible.

-5-

implant.  Assistant manager Ortiz once asked Arrieta, "old man, I'm going to be going out with someone tomorrow, and I wanted to know if you'll let me borrow your pump."  Another time, Ortiz asked Arrieta, "Miguelito, did it work with your wife[?]"  On one occasion, someone used the store's paging system to announce "that if [Arrieta] was close by to ask [Arrieta] to come to the warehouse to let him borrow a pump so that they could lift a pallet or a box."  On another occasion, when Arrieta was visiting the personnel offices, a group of department managers in a meeting with personnel manager Mieles "began making comments such as, there is Viagra Man. No, he's got force power."  As to this event, Arrieta testified, "I looked over at Miss Mieles, and I said this was the nonsense I was talking about four years ago."  Mieles did not respond in any way.

In fact, with the implant, Arrieta was initially able to engage in intercourse with his wife.  Later psychological depression, occasioned by the harassment, affected his sexual functioning.

Assistant manager Ortiz and Jose Ramos, a support manager under Ortiz, were initiators of the comments about Arrieta's condition, according to the testimony of Rey Rodriguez, one of Arrieta's co-workers.  During meetings at the beginning of the night shift, Ortiz "would come into the warehouse with a joke regarding the pump."  Rodriguez testified that Jose Ramos "would use [the paging system] to make jokes regarding the pump . . . .

[Ramos] said . . . that Arrieta was ready with his baton." Another co-worker, Eliezer Ramos, recounted an incident between Arrieta and assistant manager Ortiz. Ortiz had been particularly offensive:

> [Arrieta] had been away [on] his honeymoon, and two or three days later, . . . I heard comments from [other employees] saying that [Arrieta] was upset with Jorge, because . . . [Jorge] had asked [Arrieta] if the pump had not worked out with his wife, he should bring her to him.

Eliezer Ramos also testified that Dennis Baerga, another assistant manager and yet a third supervisor of Arrieta, once said "[L]ook, Miguel Arrieta's pump seems to be working" within the presence of assistant manager Ortiz and Gilberto Rosa, who was a department manager for cosmetics, but not Arrieta's supervisor.

Arrieta's former supervisors, Ortiz and Jose Ramos, themselves admitted key facts. Support manager Jose Ramos admitted participating in the taunting:

> Well, about what could be heard and all the fooling around they had going on in there, . . . where I did participate in those jokes, well, about a condition that was very pronounced under his pants, then . . . like everyone else, they started to make jokes with him [saying] Miguel, what is it that you've got there, come here . . . .

Assistant manager Ortiz acknowledged that he was aware of the taunting, and that Arrieta had complained to him about it:

> Q: Isn't it true that Mr. Arrieta also [on] many occasions went to you to complain about the jokes?

A: About the jokes, I remember only one time

. . . .

. . . .

Q: Isn't it true, Mr. Jorge Ortiz, that employees would see Mr. Arrieta's erection and would joke and laugh about his pump?

A: That is correct, with him.

. . . .

Q: Isn't it true, Mr. Jorge Ortiz, that upon the question of your attorney, you answered that if an inappropriate conduct or a disrespectful conduct was taken to you, you had the duty to immediately report it to your supervisor or store manager?

A: Yes, that is correct.

Q: And Mr. Arrieta did complain to you, didn't he?

A: Yes, that is correct.

Ortiz also admitted knowing that Arrieta went to department manager Gilberto Rosa to complain. Neither Ortiz nor Rosa took action in response to these complaints.

The evidence shows that Arrieta complained to superiors in his chain of command at Wal-Mart, up to the level of store manager.[3] At no level was effective corrective action taken. As

_____

[3] As near as can be told based on the record, the hierarchy at the Wal-Mart store is as follows: The store manager is the top company official at the store. Assistant managers, such as Ortiz and Baerga, report to the store manager. Support managers, like Jose Ramos, report to an assistant manager. Department managers, like Gilberto Rosa, fall below support managers, and have supervisory duties. Arrieta testified that Rosa, although not his supervisor, was nonetheless above him in Wal-Mart's hierarchy.

Ortiz admitted, Arrieta complained to him about the taunting. Arrieta asked Ortiz if he could work apart from the other employees so he would not be subject to their taunting; Ortiz allowed this. Working apart from the other employees improved the situation somewhat. But Arrieta still was subject to harassment, especially as his shift was starting and ending, at which time he was more frequently in the presence of other workers. Arrieta also complained about the taunting to Rey Font, who was store manager from about 1995 to 1996, and asked if his shift could be changed. Font denied Arrieta's request, saying, "look, Don Miguel, what do you want me to do, these are things going on between men, and what am I supposed to do; it's easier to get rid of one than to get rid of all of them."

In 1997, Arrieta made another request that he be transferred from the overnight shift to the morning shift. This time, he directed his request to Benjamin Gomez, who was Font's replacement as store manager. He told Gomez that he "was having trouble with the jokes made by the guys." Gomez, rather than transferring Arrieta to the morning shift, transferred him to the afternoon shift, which exacerbated the problem. Arrieta said that once the decision to transfer him was made, he could not decline. According to Arrieta, the change to the afternoon shift only made his problems worse -- he was still being harassed, only this time the harassment occurred in front of customers in the store, rather

than just fellow employees. He told Gomez this. In his resignation letter, Arrieta noted that when he had complained to Gomez about the change to the afternoon shift, Gomez responded "in a mocking tone of voice and sarcastically" that "we are not here to make accommodations for anyone."[4]

The harassment took an emotional toll on Arrieta. He had trouble sleeping, lost weight, and experienced a loss of libido to the point where he became unable to engage in sexual relations. On May 19, 1998, Arrieta complained to his urologist that he had a loss of sexual desire. The urologist found no physical reason for Arrieta's loss of libido, and so recommended that Arrieta see a psychiatrist or psychologist. On September 9 and October 5 of 1998, Arrieta consulted a psychiatrist, reporting loss of libido, loss of weight, and a depressive mood. The psychiatrist diagnosed Arrieta as having a dysthymic disorder with late onset. On February 5, 1999, the psychologist certified that Arrieta was disabled on account of dysthymic disorder and that such disability was not work related. Arrieta's wife, Nereida Olivencia, testified that when they got married they had plans to have children, but after Arrieta's problems began, that was no longer possible.

---

[4]  Arrieta represented in his brief that he also contacted Wal-Mart's telephone help line. The record citation he provides does not reflect this assertion, and our own review of the record shows no testimony about such a phone call.

Co-workers also noticed a change for the worse in Arrieta. Rey Rodriguez testified, "[Y]ou could see that Mr. Miguel Arrieta's emotional system wasn't working the same way anymore." Delio Crespo testified, "At first, [Arrieta] used to share a lot with us, and after [a while], he withdrew from the group to the point where I had to ask about where he was, because I couldn't see him."

Wal-Mart has an "open door policy," which, according to Wal-Mart, "permits any employee that has a grievance or is the object of illegal discrimination to complain[] to any supervisor, manager, officer or the president of the Company." (emphasis added). Wal-Mart admits that "[p]ursuant to the 'open door' policy, the grievance need not be reduced to writing; if an oral grievance is made, there is a duty to entertain it." The policy was not put into practice and a jury could easily find it existed only on paper.

No recording by the company was ever made of Arrieta's complaints, including his complaints to the Personnel Department. In fact, Mieles, the personnel manager, acknowledged that there might not be any written record of an employee making use of the open door policy and that she had never even seen such a recording for any employee, much less one for Arrieta.

Under the open door policy, the supervisors had affirmative obligations as well. Benjamin Gomez, in response to a

-11-

question by Arrieta's counsel, agreed that "any manager who would have heard or been present" during the harassment "would have had an obligation to investigate." No investigation was ever undertaken, although Arrieta had complained about the taunting to at least three supervisors in his immediate chain of command (assistant manager Ortiz, and store managers Font and Gomez), the personnel manager Mieles, and Rosa, who was not Arrieta's immediate supervisor but nonetheless a department manager. Arrieta had been taunted by at least three of his supervisors -- assistant managers Baerga and Ortiz, and support manager Jose Ramos.

Arrieta concluded it was futile to complain further to the supervisors: "[T]hese jokes . . . had been begun by supervisors themselves and had become commonplace. Who are you going to complain to?" Delio Crespo, a co-worker, agreed. In reference to the taunting of Arrieta, Crespo stated: "I didn't feel the need to . . . contact any manager, because they were all present."

Arrieta explained that he decided not to escalate his complaints about the harassment to the Wal-Mart home office because of his prior experience with that office. He never received a response to a letter he had written to the home office in 1993 about how his work experience was not meeting his expectations. Arrieta wrote this letter "because when you're given all the orientation and you're given all the chats, what would happen was actually totally opposite of the way it was supposed to be."

Arrieta said, "Since that letter was never answered, I never heard anything else about it. Then it seemed to me that with any other small incidents, it would just be wasting my time."

On October 19, 1998, Arrieta filed a charge of discrimination before the Equal Employment Opportunity Commission (EEOC) and the Department of Labor and Human Resources of Puerto Rico, alleging he had been subjected to a hostile work environment as a result of his age and medical condition. In his charge, Arrieta stated: "Often, allusions are made to my medical record, and I am the object of jokes and remarks on the part of my [s]upervisors and coworkers. I am told that I am already old, that I need a new operation because the pump does not work and other remarks that allude to an operation that I underwent approximately 4 years ago. Mocking is continuous on the part of my coworkers and [s]upervisors . . . ."

Arrieta received two written reprimands after this date. On October 23, 1998, Arrieta was reprimanded for failing to secure keys which could be used to access and steal merchandise. Then, on November 2, 1998, Arrieta was reprimanded for working twenty-four minutes of overtime without the prior authorization of an assistant manager. Arrieta considered the reprimands to have been unwarranted and given in retaliation for his having filed a discrimination complaint with the EEOC.

An undated document in evidence titled "Exit Interview" indicates that Arrieta's last day of work was November 2, 1998. While the record is not clear about the details of Arrieta's departure from Wal-Mart, Wal-Mart claims that Arrieta was given a leave of absence on that date.[5] Arrieta formally resigned on May 12, 1999. He left "because of [his] emotional state and . . . the emotional state it was causing in [his] wife, and the fact that [he] had already submitted documentation and filed a complaint because of discrimination, and the fact that back in October when [he] had returned, they had begun planning or orchestrating a way to provide me with warnings." At his exit interview at Wal-Mart, Arrieta noted that he was resigning because he was "constantly harrass[ed] by supervisor [and] co-workers."

## II.

On March 22, 2000, the EEOC issued Arrieta a Notice of Right to Sue. Arrieta filed suit on June 21, 2000 against Wal-

---

[5] Wal-Mart asserts that Arrieta requested the November leave of absence, and that in his request he did not mention the harassment he had suffered. In support, Wal-Mart points to a letter in the record written by Arrieta to the Cooperativa de Seguros de Vida (COSVI), a Puerto Rico governmental agency. That letter does not make mention of harassment. But there is nothing in this document itself or in the transcript of the trial proceedings to connect this letter to a request for a leave of absence. Also in evidence was a request for a leave of absence filled out by Arrieta in August 1998, in which Arrieta requested a personal leave of absence for "[h]ealth problems in the family." According to Arrieta, he was given this leave of absence in September 1998 for his own illness. Thus, this particular document also seems unrelated to any leave of absence commencing in November, and Wal-Mart does not assert that it is related.

Mart, alleging violations of the ADA, the Age Discrimination in Employment Act (ADEA), and several provisions of Puerto Rico law. On January 14, 2004, the district court granted Wal-Mart's motion for summary judgment as to Arrieta's claims under the ADEA, but allowed Arrieta's hostile work environment and constructive discharge claims under the ADA and state law to go to jury trial.

During the trial, both Arrieta and Wal-Mart submitted proposed jury instructions. Wal-Mart proposed the following instruction regarding its anti-discrimination policy, as part of a broader instruction on the required elements of a hostile work environment claim:

> Defendant, however, has what it calls the Open Doors Policy as part of the anti-discrimination policy of Wal-Mart; this procedure has been instituted to vent any serious grievance. In furthering this policy, Wal-Mart submitted evidence that it has implemented continuous training procedures wherein it emphasizes the respect for the individual, the illegality of discrimination and the importance for Associates of utilizing the Open Doors Policy when such recourse is necessary. The defendant claims that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. If you find that such is the case, in this regard you must find for the defendant, because the plaintiff failed to place the defendant on notice of any grievance that he may have had, and therefore did not place the defendant in a position to do anything on the subject of this litigation.

At the end of the eighth day of trial, counsel for both sides convened with the judge in his conference room to review the

-15-

instructions. Later, when the judge instructed the jury, Wal-Mart's requested instruction regarding the open door policy was not given. Wal-Mart, which has raised on appeal the issues regarding the jury instructions, has not provided us a transcript of the pre-charge discussions. Wal-Mart has pointed us to two instances in the record where it made clear its objections to the instructions, and both occurred after the jury had heard the instructions. The first objection was made immediately after the charge to the jury. The transcript of this post-charge discussion is fairly sparse, and refers to pre-charge discussions that are not in the record. The next objection was made in Wal-Mart's post-verdict motion. Those objections are described later.

Arrieta, for his part, requested only one additional instruction, which sought to avoid having the jury draw a negative inference from the fact that the EEOC did not make any determination on Arrieta's complaint; this proposed instruction was denied. Arrieta made no other objections to the instructions.

At the end of Arrieta's case in chief, Wal-Mart moved for judgment as a matter of law under Fed. R. Civ. P. 50 on the grounds that Arrieta had failed to establish that he was disabled within the meaning of the ADA. However, Wal-Mart failed to renew its motion at the close of all the evidence. On January 30, 2004, the jury returned a verdict in Arrieta's favor on the ADA claims and in

-16-

Walmart's favor on the state law claims, and awarded Arrieta compensatory damages of $76,000 and punitive damages of $160,000.

Both Wal-Mart and Arrieta made post-judgment motions. Wal-Mart sought judgment as a matter of law under Fed. R. Civ. P. 50 (this time, raising the claim that Arrieta had not established that he was disabled under the ADA), a new trial under Fed. R. Civ. P. 59, or vacation of the judgment under Fed. R. Civ. P. 60(b)(6). Arrieta sought an award of back pay and front pay. The district court denied both parties' motions for reasons discussed below.[6]

**III.**

Wal-Mart's Appeal

A. Jury Instruction on Ellerth-Faragher Defense

This case involves evidence of both harassment by supervisors and harassment by co-workers. In two companion cases decided in 1998, the Supreme Court addressed the question of an employer's vicarious liability for actionable discrimination by a supervisor with immediate or successively higher authority over the plaintiff employee. Ellerth, 524 U.S. 742; Faragher, 524 U.S. 775.

Prior to Ellerth and Faragher, cases had established the standard for employer liability for co-worker harassment of the

---

[6] We note that this circuit has never squarely answered the question of whether hostile work environment claims are cognizable under the ADA. Wal-Mart addressed the issue before the district court, but does not press the issue here, and so we proceed on the assumption that such a claim is cognizable. See Rocafort v. IBM Corp., 334 F.3d 115, 120-22 (1st Cir. 2003).

plaintiff employee.  Ordinarily, where the harassment is by a non-supervisory co-worker, the employer is liable only if the plaintiff can show that the employer "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate action."  Crowley v. L.L. Bean, Inc., 303 F.3d 387, 401 (1st Cir. 2002) (quoting White v. N.H. Dep't of Corr., 221 F.3d 253, 261 (1st Cir. 2000)).

As to actionable discrimination by supervisors, Faragher articulated some clear lines:

(1) "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  Faragher, 524 U.S. at 807.

(2) Where "no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence."  Id.

(3) "No affirmative defense is available . . . when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  Id. at 808.

(4) The affirmative defense, when available, "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b)that the plaintiff employee unreasonably failed to take

-18-

advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807. The employer bears the burden of proof as to both elements. Id. at 807-08.

(5) As to the first element of the defense, proof of an anti-harassment policy with a complaint procedure available to employees, while not necessarily dispositive, is relevant. Id. at 807.

(6) As to the second element of the defense, proof that the employee failed to meet his obligation of using reasonable care is not limited to an unreasonable failure to use such a procedure, although such proof will normally suffice to meet the employer's burden. Id. at 807-08. See also Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 32 (1st Cir. 2003); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 20 (1st Cir. 2002).

After Ellerth and Faragher, the question that arose was whether a constructive discharge, occasioned by supervisor harassment so severe it was intolerable, constituted a per se tangible employment action so as to preclude the assertion of the Faragher affirmative defense. This court addressed the question in Reed. See 333 F.3d at 32-33. As is often our wont, we said that while other circuits had adopted hard and fast per se rules as to whether a constructive discharge was or was not a tangible employment action, we would not adopt such a rule. Id. at 33

("[W]e see no reason to adopt a blanket rule one way or the other. Here, it is clear to us that the constructive discharge label cannot be used to preclude the affirmative defense."). Instead, we focused on whether the supervisor's action was an "official action" comprising the kind of tangible employment action (e.g., discharge, reduction in pay) that the Supreme Court appeared to have in mind. Id. Reed did allow for the possibility that, on other facts, the affirmative defense as to supervisor harassment could be precluded in a constructive discharge case.

The Supreme Court addressed the same issue in Pennsylvania State Police v. Suders, 542 U.S. 129 (2004), adopting a test similar to that in Reed. Suders held that constructive discharge is not a per se "tangible employment action." Rather, it held that a "tangible employment action" was an "official act," that is, "an employer-sanctioned adverse action officially changing [the employee's] employment status or situation, for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which [the employee] would face unbearable working conditions." Id. at 131, 134. Such an official act can both precipitate an employee's constructive discharge and be a "tangible employment action" that would preclude the employer's resort to the Faragher defense. See id. at 148-49.

Where the evidence shows that the defendant cannot prove an affirmative defense under the Faragher standard, there is no

-20-

reason to remand for the giving of a Faragher instruction. See O'Rourke v. City of Providence, 235 F.3d 713, 736 (1st Cir. 2001). Indeed, in Faragher itself, the Supreme Court declined to remand because the factual findings made in the trial court demonstrated that the employer was not, on the evidence, entitled to the defense. 524 U.S. at 808-10.

In this case, the court instructed the jury on January 29, 2004, rejecting defendant's proposed Ellerth-Faragher instruction. At that time, Suders had not yet been decided, but Reed had been. Nonetheless, Wal-Mart did not ask for an instruction on whether a tangible employment action, or a "tangible event" as that term is defined by Reed, had taken place. Instead, Wal-Mart's instruction assumed there was no tangible employment action and that it was entitled to assert the Ellerth-Faragher defense.

In its ruling on the post-judgment motion the court said it had declined to give the proposed instruction because the Ellerth-Faragher defense was not applicable. The court found, in essence, that no reasonable jury could have concluded that either element of the defense had been met. First, the court noted that the open door policy existed on paper, but had not been put into practice. Indeed, when Arrieta complained to the Personnel Department and to several supervisors, no corrective actions were taken and his complaints were not even recorded. Second, the

-21-

evidence was that Arrieta had reasonably availed himself of the procedures and the company had more than sufficient notice of the problems.  We can find no reversible error; as in Faragher, the evidence did not support giving the instruction, irrespective of whether Wal-Mart's conduct amounted to a tangible employment action.

On this record there is and can be no assertion the jury was misled or that there has been a miscarriage of justice.  The instruction the court gave placed the burden on the plaintiff to show not only that his work conditions were intolerable but also that his employer knew or should have known about the intolerable conditions and deliberately allowed them to recur.  Thus, whether or not the supervisors themselves engaged in harassment, the supervisors, including Wal-Mart's own personnel department, were well aware of the co-worker harassment and chose to let it occur, providing another basis for Wal-Mart's liability.

B.        Sufficiency of Evidence Challenges to Verdict

    1.    Sufficiency of Evidence to Support Finding Arrieta Was Disabled Within the Meaning of ADA

Were we forced to squarely confront it, the question of whether Arrieta suffered from a disability or was regarded as having a disability within the meaning of the ADA, as found by the jury, would be a difficult one.  However, Wal-Mart failed to preserve appellate review of the issue by failing to renew its Rule 50 motion at the close of all the evidence.  See Muniz v. Rovira,

373 F.3d 1, 5 & n.2 (1st Cir. 2004). Wal-Mart's "failure rendered inutile [its] post-trial motion for judgment notwithstanding the verdict and precluded ordinary appellate review of sufficiency of the claim." Surprenant v. Rivas, 424 F.3d 5, 12 (1st Cir. 2005). We have observed that "requiring the motion to be made at the close of all the evidence gives the opposing party an opportunity to respond to any evidentiary deficiencies noted by the motion by seeking to reopen the evidence prior to submission of the case to the jury." Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 758-59 (1st Cir. 1994). For that reason, "[a] party's failure to move under Rule 50 at the close of all evidence 'cannot be taken lightly.'" Castillo v. Autokirey, Inc., 379 F.3d 4, 9 (1st Cir. 2004) (quoting Jusino v. Zayas, 875 F.2d 986, 991 (1st Cir. 1989)).

Wal-Mart admits the procedural default, but argues that nonetheless we have some room to review the claim, based on our "modicum of residual discretion to inquire whether the record reflects an absolute dearth of evidentiary support for the jury's verdict." Faigin v. Kelly, 184 F.3d 67, 76 (1st Cir. 1999); see also Surprenant, 424 F.3d at 13. This review is exceedingly narrow, and "only very unusual circumstances will justify treating a motion at the close of the plaintiff's case as a surrogate for a motion at the close of all the evidence." Keisling, 19 F.3d at 759.

Such extraordinary review is not warranted in this complicated case. Under <u>Bragdon</u> v. <u>Abbott</u>, 524 U.S. 624 (1998), "reproduction is a major life activity for the purposes of the ADA" and "[r]eproduction and the sexual dynamics surrounding it are central to the life process itself." <u>Id.</u> at 638-39. But at the same time, <u>Sutton</u> v. <u>United Air Lines, Inc.</u>, 527 U.S. 471 (1999) held that "if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures -- both positive and negative -- must be taken into account when judging whether that person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." <u>Id.</u> at 482.

Both <u>Sutton</u> and <u>Bragdon</u> have to do with actual disability. But here the jury explicitly found that Arrieta was either disabled or "regarded as" disabled. Under the ADA, a plaintiff is "regarded as" disabled if he:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;

> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or

> (3) Has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

-24-

29 C.F.R. § 1630.2(l); see Rodriguez v. ConAgra Grocery Prods. Co., 2005 WL 3036318 (5th Cir. Nov. 14, 2005) (discussing "regarded as" basis for liability). Whether Arrieta met either the actual disability or the "regarded as" test is not an easy issue.

Absent preservation of the issue, and any clear explication of it even on appeal, we decline to address the issue.

### 2. Sufficiency of Evidence To Support Hostile Work Environment

Wal-Mart argues that the evidence was insufficient to support the jury's finding that there was a hostile work environment that reasonably led to a constructive discharge. Wal-Mart raised this challenge before the district court as part of its post-verdict motion for a new trial.[7] The district court denied the motion.

Wal-Mart faces a daunting appellate standard of review. We review denials of motions for a new trial for abuse of discretion, keeping in mind that "[a] district court should only grant such motions if 'the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice.'" Johnson v. Spencer Press of Me., Inc.,

---

[7] Wal-Mart raised the same argument in a Rule 60(b)(6) motion. See Fed. R. Civ. P. 60(b)(6). The district court noted that "Wal-Mart [did] not present an argument for relief under Rule 60(b)(6) that is separate and distinct from its arguments under Rule 59." Therefore, it recharacterized the motion under Rule 60(b)(6) as one under Rule 59, noting that "even if Wal-Mart's arguments were considered under the rubric of Rule 60(b)(6), the outcome would be the same."

364 F.3d 368, 375 (1st Cir. 2004) (quoting Ramos v. Davis & Geck, Inc., 167 F.3d 727, 731 (1st Cir. 1999)).

There is no abuse of discretion here.  As the district court correctly noted:

> [T]here was evidence presented as to the constant mockery and harassment that Arrieta was subjected to by fellow co-workers and supervisors alike due to his condition; there was evidence presented that this harassment was constant and unbearable, leading to Arrieta's resignation; and there was evidence that Arrieta's supervisors knew about the harassing conduct and rather than stop it, participated in it.

As a result, the jury verdict as to the existence of a hostile work environment is not "against the clear weight of the evidence."

C.      Damages

1.      Adequacy of Evidence to Support Punitive Damages

After the award of punitive damages, Wal-Mart asked that the verdict of punitive damages be set aside, altered, or amended under Fed. R. Civ. P. 59(e).[8]  The court denied the motion, saying that it had given the proper instruction under Kolstad v. American Dental Ass'n, 527 U.S. 526, 538, 545 (1999) (holding under Title VII that punitive damages are available only upon a showing that the employer acted with "reckless indifference" or "malice" and that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where

---

[8] The court said it would reach the same outcome if the motion were considered under Fed. R. Civ. P. 60.

these decisions are contrary to the employer's good-faith efforts to comply with Title VII" (internal quotation marks omitted)).  The court reasoned that it was up to the jury to weigh each side's characterization of Wal-Mart's open door policy.  The jury chose to believe Arrieta.

Our review of the denial of the motion to alter or amend the judgment under Rule 59(e) is for abuse of discretion.  McCord v. Horace Mann Ins. Co., 390 F.3d 138, 144 (1st Cir. 2004).  If the district court committed an error of law, such as an improper instruction harmful to the outcome of the case, that would be an abuse of discretion.  Even if an instruction was erroneous, we ask whether we can say with fair assurance that the jury verdict was likely unaffected.  See Putnam Res. v. Pateman, 958 F.2d 448, 471 (1st Cir. 1992).

As to punitive damages, the district court instructed:

> In order to find punitive damages, you must find that the acts of the Defendant which proximately caused actual damages to the Plaintiff were maliciously or wantonly done.
> If you so find, you may add to the award of actual damages such amount as you shall agree to be proper as punitive damages.
> An act or failure to act is maliciously done if prompted or accompanied by ill-will, spite or grudge, either toward the injured person individually or towards all persons in one or more groups or categories of which the injured person is a member. An act or failure to act is wantonly done if done in reckless or callous disregard of, or indifference to the rights of one or more persons, including the injured person.

While this is not a precise <u>Kolstad</u> instruction, it is close.  As this court said in <u>Romano</u> v. <u>U-Haul Int'l</u>, 233 F.3d 655 (1st Cir. 2000), in <u>Kolstad</u> the Supreme Court held:

> [A]n employer may be liable for punitive damages under Title VII in four instances: (1) when the agent has been authorized by the principal to commit the misconduct in question; (2) when the principal recklessly employed the unfit agent; (3) when the agent, acting in a managerial capacity, committed the misconduct within the scope of the employment; or (4) when the agent's bad act was subsequently approved by the principal.  The Court limited the reach of the third situation by absolving an employer from liability for punitive damages if a good-faith effort to comply with the requirements of Title VII is made.

<u>Id.</u> at 669 (citations omitted).

Wal-Mart's objection to the instruction, both before the district court and on appeal, is unclear.  Wal-Mart does not argue that the district court's instruction was erroneous because it did not mention the good-faith aspect of <u>Kolstad</u>.  Rather, Wal-Mart argues that because it had provided ample evidence of its open door policy, "Arrieta's supervisors' misconduct could not be imputed to Wal-Mart and the instructions to the jury should not have been given."  In sum, Wal-Mart's position appears to be that, as a matter of law, punitive damages are unavailable if there is <u>any</u> evidence of good-faith efforts by the employer to comply with the law.  Wal-Mart's position is wrong and would allow companies to pay lip service to the law while blatantly violating it.

-28-

The difficulty for Wal-Mart is that the Supreme Court did not adopt a test that any evidence of a good-faith effort could shield it from liability; rather, it required a finding of a good-faith effort to comply with the law. On these facts, a jury could easily conclude that the open door policy was a sham designed to give the appearance, but not the reality, of an effort to comply with the law, and that Wal-Mart acted with reckless disregard of Arrieta's rights. Goya, 304 F.3d at 30; Romano, 233 F.3d at 670.

That leaves Wal-Mart's argument that there was insufficient evidence for a jury to award punitive damages. Wal-Mart argues that any conscious wrongdoing by supervisors could not be imputed to Wal-Mart because there was a lack of evidence that the managers who taunted Arrieta and ignored his complaints were acting within the scope of their employment. We reject this argument; we agree with the district court that, on these facts, a reasonable jury could have found that the supervisors were acting in the scope of their employment. We agree with the district court that a reasonable jury could award punitive damages.

2. Mitigation of Damages

Wal-Mart argues that Arrieta "failed to mitigate [his damages] when he failed to avail himself of Wal-Mart's grievance procedures against discrimination." Wal-Mart did not raise this precise argument before the district court, and does not here explain why the argument ought to change the outcome. Indeed, the

argument may be nothing more than an attempt by Wal-Mart to get in through the back door that which will not fit in the front, namely, the Ellerth-Faragher defense. The argument may also be that the compensatory damages awarded by the jury were excessive.

Whatever the argument may be, it must fail because the factual underpinning -- that Arrieta failed to take advantage of the open door policy -- is simply not supported by the record taken in the light most favorable to upholding the jury verdict. Arrieta made numerous complaints about the harassment to his immediate supervisors and the Personnel Department, and Wal-Mart had ample notice of Arrieta's complaints.

**IV.**

Arrieta's Appeal

Arrieta appeals from the denial of his post-verdict motion that he be awarded equitable remedies of nearly five years of back pay and front pay. We affirm. Arrieta brought this situation on himself.

As the district court correctly noted, in this circuit when the jury is asked, as here, to resolve issues of liability and compensatory damages, the issue of back pay is normally decided by the jury as well. See Johnson, 364 F.3d at 379-80. Here, Arrieta did not advise the court before the jury was instructed that he wished to reserve the issue of back pay from the compensatory damages calculation by the jury, nor did he object to the

-30-

instructions on compensatory damages.  So the district court was not put on notice that Arrieta wished to have the issue of back pay decided by the court.  We are not inclined to hold the plaintiff harmless from the foreseeable consequences of his actions.  <u>See</u> <u>Saldana Sanchez</u> v. <u>Vega Sosa</u>, 175 F.3d 35, 37 (1st Cir. 1999) (rejecting plaintiff's claim for back pay where the plaintiff failed to request an explicit instruction).

The district court went on to say that Arrieta had failed to provide evidence that he had looked for work or was unable to work, and so he had not met the mitigation requirement for an equitable award of back pay.  We cannot say this was plain error, even giving plaintiff the benefit of plain error review rather than finding that he had waived the issue.

As to front pay, the district court held it would not, on the evidence before it, exercise its discretion to make an award.  "Front pay should not be awarded unless reinstatement is impracticable or impossible."  <u>Johnson</u>, 364 F.3d at 380.  The court held that Arrieta did not request reinstatement, and had set forth no evidence of impossibility or impracticability of reinstatement, of inability to work, or of work life expectancy.  There was no abuse of discretion.

**V.**

We reject the appeals from both sides and <u>affirm</u>.  No costs are awarded.