# United States Court of Appeals
## For the First Circuit

Nos. 04-2413, 04-2414

BLANCA VALENTÍN-ALMEYDA,

Plaintiff, Appellee,

v.

MUNICIPALITY OF AGUADILLA; JUSTO CRUZ,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

Before

Selya, Circuit Judge,
Hansen,[*] Senior Circuit Judge,
and Lynch, Circuit Judge.

Yvonne M. Menéndez-Calero, with whom Quiñones, Sánchez & Guzman, P.S.C. was on brief, for appellant Justo Cruz.
Lizabel M. Negrón for appellant Municipality of Aguadilla.
Juan Rafael González Muñoz, with whom González Muñoz & Vicéns Sánchez, Victor Miranda Corrada, and Miranda Corrada Law Office were on brief, for appellee Blanca Valentín-Almeyda.

May 9, 2006

[*] Of the Eighth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**. The Municipality of Aguadilla, Puerto Rico, and one of its police officers, Sgt. Justo Cruz, appeal from respective jury awards against them totaling over $1 million.  The sums were awarded to Blanca Valentín-Almeyda, a municipal police officer, on her Title VII, 42 U.S.C. § 2000e et seq., and Puerto Rico Law 17, P.R. Laws Ann. tit. 29, § 155 et seq., claims of sexual harassment, retaliation, and violation of due process.

The defendants argue that the evidence was insufficient to support either liability or the damages awarded, and, as a result, the district court erred in denying their motion under Federal Rules of Civil Procedure 50(b) and 59(a) for judgment notwithstanding the verdict, remitittur, or a new trial.

The Municipality also attacks the verdict form, arguing that it led the jury to award duplicate damages, and the court's failure to instruct the jury on the affirmative defense recognized in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries v. Ellerth, 524 U.S. 742 (1998).  The Municipality concedes that it has forfeited these claims by decisions it made at trial.

The defendants also mount unsuccessful attacks on the district court's rulings that the Law 17 claim against Cruz was not time-barred, that certain evidence was inadmissible, and that

reinstatement was proper.  In short, the defendants lost this case at trial and they cannot win it here.  We affirm.

                                    I.

We recount the evidence in the light most favorable to the verdict.  See Arrieta-Colon v. Wal-Mart P.R., Inc., 434 F.3d 75, 79 (1st Cir. 2006).

Valentín worked for the Municipal Police of Aguadilla from February 15, 1997 until January 27, 2003, when her employment was terminated.[1]  She was trained at the Police Academy, where she graduated at the top of her class.  She worked for a two-year probationary period before she became a permanent employee.  Her supervisors, including Cruz, and her coworkers agreed she was a good police officer.

Cruz was an administrative sergeant whose duties included checking the officers' entry and exit logs.  He kept track of attendance and could impose sanctions for attendance problems.  At times, he had direct supervisory authority over Valentín.  He also had some power to affect her work assignments.  He worked in a small shared space with a secretarial pool of four or five secretaries, including Norma Gonzalez and Norma Ortiz.

In February 2000, Valentín, then aged thirty-six, separated from her husband; they ultimately were divorced in March

---

[1] Valentín also had been a police officer from 1988 or 1989 to 1990, leaving for reasons not material to this case.

-3-

2001. In August 2000, Cruz began a crude campaign to win her affections. His comments were mild initially. He told her on several occasions that she had "pretty eyes" and "nice hair" and that her husband did not appreciate what he was leaving behind. He also told her she looked beautiful in the morning. Valentín objected to Cruz' remarks. But instead of stopping, Cruz escalated matters in September and October of 2000. He told Valentín she had "great legs" and twice told her she had "horny" eyes. Although Valentín was upset and tried to discourage him, he persisted, telling her many times that she was "hot-hot-hot." He then told her that her legs were "pretty enough" to have "hooked over his shoulders."

A number of people at the station knew that Cruz was chasing Valentín. Norma Ortiz, one of the secretaries, confirmed that Cruz made the reported comments about Valentín's hair, smile, and legs; that Cruz made such comments only to Valentín; and that Valentín "looked upset" because of his approaches.

Valentín complained to Officer Hector Villanueva, a friend of hers and a foot patrolman in the municipal police department, that since her divorce, Cruz was constantly "after her." Villanueva observed Valentín become upset after Cruz said something to her in the hallway. He noticed that Cruz always went out of his way to be near Valentín and to "sidle up next to her."

Cruz took to driving by Valentín's house multiple times on the same day and honking his horn. He admitted doing this to Villanueva, who also observed him do it.[2]

Although the defense denied that the Police Commissioner, Reynaldo Fernández, was aware of the situation, that was contradicted by Villanueva's testimony that the Commissioner told Cruz, in front of Villanueva and another officer, to get "that little girlfriend of yours" (emphasis added) under control. The other officer was Sgt. David Ferrer, who was second in the police hierarchy and Cruz' good friend.

Valentín testified that in early October 2000, she complained about Cruz' comments to Norma Gonzalez, the secretaries' supervisor and designated complaint-receiver. The Commissioner had told the female police officers that if they had any problems with male officers, they should go to Gonzalez, who reported directly to him. After that complaint, Cruz' approaches to Valentín stopped for a few weeks.[3]

Also in October 2000, Valentín attempted to meet with the Commissioner to complain about Cruz, who had become upset with her because she never greeted him with a kiss on the cheek. She

---

[2] Cruz conceded frequently driving by, but he said this was because his house was nearby, and he denied honking his horn.

[3] Gonzalez denied that Valentín had ever complained to her about Cruz. But Ortiz testified that Valentín said she was going to complain to Gonzalez about Cruz and that Valentín did tell Gonzalez that she needed to talk to her about Cruz.

testified that this was the first, but not the only, occasion on which she tried to meet with the Commissioner. The Commissioner greeted her at the door, but instead of hearing her complaints against Cruz, he told her to meet with Lt. Juan Vélez, an internal affairs investigator charged with handling equal employment opportunity charges for the municipal police. She met with Vélez that same day; he put his arm over her shoulders and said Cruz was not at fault, "that it was [her] fault because [she] had him bedazzled." Cruz and Vélez were good friends. The Mayor, Carlos Méndez, testified that Vélez and the Commissioner did not at that time bring the allegations to his attention, even though Vélez' job was to bring sexual harassment allegations to the Commissioner, who was supposed to bring them to the Mayor.

After her first attempt to complain to the Commissioner, Valentín testified, she suffered two forms of retaliation. Between October 2000 and January 2001, she was assigned more than five double shifts, although such assignments were uncommon in the Aguadilla police force. She was also transferred in October 2000 from the traffic unit, which was regarded as "privileged," to the rotating shifts assignment and then to Las Cascadas water park, which was regarded as "punishment" because it was remote and the work was solitary. Although it was common for officers "working shifts" to be assigned to Las Cascadas a few times per week, Valentín was permanently assigned there for a one-month period

spanning the holidays, ending in early January 2001.[4]   Two weeks into her posting at Las Cascadas, while she was on duty, Cruz visited and told her that "[w]henever [she] stop[ped] being such a spoiled rotten kid, [he] could get [her] out of there."

Cruz' approaches recommenced in November 2000, when he left a note under the wiper of Valentín's car saying that she was "his" and that she should not be giving rides to fellow officers. In December 2000, he began to repeatedly ask Valentín if her divorce was final yet, telling her that he wanted to marry her and offering her money to help finalize the divorce.

Valentín felt uncomfortable and continued to rebuff Cruz' approaches.   In approximately January 2001, when Valentín again said she was not interested in him, he became angry and told her she would be "screwed" -- that she "had to be more affectionate with him" or else he and his friend Ferrer would exact retribution.[5]   Ferrer was in charge of work assignments, and Cruz also had some assignment authority.

In January 2001, Valentín attempted to complain directly to the Mayor.   She told him she wanted to discuss Cruz, and that

---

[4] Cruz testified that Valentín did not complain.   All the officers had to work at Las Cascadas once in a while.   But long assignments there were seen as punishment.

[5] Valentín testified that Cruz told her that Ferrer had it in for her, that so far he (Cruz) had been "protecting" her from Ferrer, and that this supposed protection would cease if she would not be more affectionate.

she had already attempted to speak with the Commissioner, who had paid no attention. The Mayor told her "he wouldn't have anything to do with [her]," because the Commissioner "was like his brother."[6]

On February 10, 2001, Valentín was at the mall with her son, and she noticed that Cruz was behind her. She accused him of following her, saying this was the third or fourth time such a thing had happened, but Cruz denied any such thing. Valentín told him she might complain again to the Commissioner. By this time Valentín had already tried to complain to the Commissioner twice (in October 2000 and on another date unclear from the record).

On February 14, 2001, Valentín went to the station house, intending to try yet again to meet with the Commissioner and to pick up her paycheck before beginning her shift in the town square. Just before noon, as she was en route, Cruz called her on her cellular phone and told her not to show up. He told her that she had to go to Las Cascadas and should not come to the station house. Valentín told Cruz that she was going to meet with the Commissioner. She did go to the station house, where she collected her paycheck, but was thereafter prevented from complaining to the Commissioner by the trio of Cruz, Ferrer, and Vélez.

---

[6] The Mayor denies this; he testified that Valentín never came to complain about sexual harassment before February 14, 2001.

Ferrer told her not to leave, whereupon Cruz gave her a warning letter about her tardiness on an earlier occasion. Valentín said she wanted to speak with the Commissioner, and Cruz told her he was not in. Ferrer told her to wait at the dispatch officer's station, because he had to give her other documents. Vélez then called Valentín into his office and told her she was the subject of an internal complaint pertaining to Valentín's allegedly telling Officer Wilfredo Nieves to "go to hell" a month and a half earlier, on December 28, 2000. Ferrer then came into Vélez' office and gave Valentín another admonishment letter, this one pertaining to an allegedly unauthorized absence.

After Ferrer left, Valentín started to tell Vélez (who was in charge of conducting sexual harassment investigations) about the situation with Cruz, noting that she had not received any admonishments until that very day, just when she was planning to file a grievance. She told Vélez that she was being sexually harassed; he asked her if she was going to file a complaint against Officer Nieves, and she told him "he knew very well who it was going to be against" -- she had already complained to Vélez about Cruz in October 2000. Vélez told her that the Commissioner was not present and she would have to wait to meet with him.

After a frustrating hour during which she got nowhere and received documents pertaining to three separate disciplinary matters, an agitated Valentín went to the dispatch area. There she

attempted to call an organization that provides legal services to police officers, but Ferrer took the telephone from her hands. There are varying accounts of her behavior and that of other participants, but the upshot is that she left the station by ambulance, having suffered what she calls a nervous breakdown.

She did not return to her job until October 1, 2001. Between February 14 and October 1, she received psychiatric treatment from the State Insurance Fund (SIF), which "referred [her] for rest." It is unclear whether she received some disability payments during this period. She testified that she exhausted sick leave and vacation leave, ceased earning a salary in mid-April, and fell behind on her mortgage. She asked for permission to return to work because she needed the money. She continued treatment once she returned to work.

On February 26, 2001, Valentín filed an administrative complaint before the Anti-Discrimination Unit of the Puerto Rico Department of Labor; the complaint was referred to the Equal Employment Opportunity Commission (EEOC) under a work-sharing agreement. On the complaint, Valentín lists the Municipality, Cruz, and Vélez as having discriminated against her. The complaint alleges sexual harassment by Cruz and retaliation by Cruz "and other supervisors." It was only after Valentín filed the administrative complaint that there was any investigation of her

claims of harassment; the Mayor then ordered an internal investigation.[7]

Valentín returned to work on October 1, 2001 and was assigned to the San Antonio station house. She and another officer were assigned to do foot patrols. The other officer was armed; Valentín was not. Her psychiatrist recommended that she work at an office or on dispatch, to avoid having to intervene with people. After eighteen days of foot patrol, Valentín was assigned to a state police station classifying complaints, which she did until January 28, 2002. Valentín testified that she was supervised there by a state police sergeant, but also that she was visited once or twice a week by the Commissioner, Ferrer, and Cruz. She left because of these visits, which made her too uncomfortable to continue working and forced her to once again seek time off and treatment from the SIF.

On January 3, 2003, while away from work and under treatment, Valentín filed this lawsuit in the Puerto Rico federal district court, alleging violations of Title VII and Law 17. She named as defendants the Municipality, Cruz, and Vélez. She later added Méndez, the Mayor, as a defendant.

---

[7] The Mayor testified that he initiated the internal investigation after learning that Valentín had complained to the state police. Neither party has called this complaint to our attention. We need only note that, from the record, it appears that this complaint post-dated the events of February 14, 2001 and was essentially contemporaneous with the administrative complaint.

-11-

On January 28, 2003, she received clearance from SIF to return to work. She returned that very day, signing in for duty and remaining at the station house until noon, when she was summoned to the Human Resources Department. There she was given a letter written by the Mayor, dated January 27, 2003. It was a letter of intent to lay off; the reason given was that she had not reported to work for over 360 days. The parties stipulated that Valentín was terminated from employment "as per" this letter. In response to this discharge, Valentín amended the complaint that she had already filed in the federal district court to include an additional retaliation claim and a due process claim.

The district court dismissed Valentín's Title VII claims against Méndez, Cruz, and Vélez, applying district court precedent to the effect that Title VII does not impose liability on individuals. Valentín does not appeal this determination. This left, as to the individual defendants, the Law 17 claims. The district court denied the individual defendants' motion to dismiss these claims as time-barred, holding that Valentín had tolled the statute of limitations on her Law 17 claims when she filed her administrative complaint on February 26, 2001. The court did grant Méndez' motion to dismiss the claims against him in his personal capacity. After Valentín rested her case at trial, the court dismissed the claims against Vélez.

The jury found the Municipality liable for $250,000 in compensatory damages on the Title VII claim.  The jury awarded $250,000 against the Municipality and $80,000 against Cruz individually in compensatory damages on the Law 17 claims.  Finally, the jury found the Municipality liable for $125,000 in compensatory damages on the due process claim.  The total initial jury award was $705,000.  After the verdict, Valentín sought and obtained reinstatement and doubling of the damages on the Law 17 claims; this doubling of the Law 17 amounts resulted in a total jury award that just topped $1 million.  The court denied the defendants' joint motion requesting judgment notwithstanding the verdict, remittitur of the damages award, or a new trial. Cruz and the Municipality appeal.

II.

A.        Legal Standards

Valentín's Title VII and Law 17 claims alleged both sexual harassment and retaliation for her complaints about the harassment.[8]   The sexual harassment case encompassed both the theories of hostile work environment and quid pro quo.  The claims

_____

[8]   Cruz and the Municipality say the standards for liability governing Title VII claims are the same as those governing Law 17 claims, see Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 52 (1st Cir. 2000), and they argue only under Title VII standards.  As this approach only simplifies matters for Valentín, we proceed solely under Title VII.

-13-

also invoke the law on employer liability for the harassing acts of a co-worker and a supervisor.

Under Title VII of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to discharge or otherwise to discriminate against a person with respect to "compensation, terms, conditions, or privileges of employment," because of the person's sex.  42 U.S.C. § 2000e-2(a)(1).

One way of violating Title VII is "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993).  In O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001), we described the essence of a hostile work environment claim: "Title VII . . . allows a plaintiff to prove unlawful discrimination by showing that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Id. at 728 (quoting Harris, 510 U.S. at 21) (some internal quotation marks omitted).  In O'Rourke, we described the "sufficiently severe or pervasive" element as one of several a plaintiff must establish to show a hostile work environment:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually

-14-

> objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Id.

Application of the hostile work environment test requires an assessment of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. Although offhand remarks and isolated incidents are not enough, "[e]vidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment." O'Rourke, 235 F.3d at 729.

Quid pro quo sexual harassment also violates Title VII. In this form of harassment, "an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the subordinate's employment." Id. at 728; see also Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 52 (1st Cir. 2000) ("Under Title VII, quid pro quo sexual harassment can be shown where a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands.").

Retaliation, yet another basis for liability under Title VII, is discrimination against an employee because the employee has, inter alia, "opposed" an unlawful employment practice under Title VII or "made a charge . . . or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). A retaliation claim requires a showing that (1) the plaintiff engaged in protected conduct; (2) she was subjected to an adverse employment action; and (3) there was a causal connection between the first and second elements. Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). Protected conduct includes not only the filing of administrative complaints, id., but also complaining to one's supervisors. Benoit v. Technical Mfg. Corp., 331 F.3d 166, 175 (1st Cir. 2003). An employment action, to be adverse, "must materially change the conditions" of the plaintiff's employment; examples include "disadvantageous transfers or assignments" and "unwarranted negative job evaluations." Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002) (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)).

"Once the plaintiff has made a prima facie showing of retaliation," the "defendant must articulate a legitimate, non-retaliatory reason for its employment decision. If the defendant meets this burden, the plaintiff must now show that the proffered legitimate reason is in fact a pretext and that the job

-16-

action was the result of the defendant's retaliatory animus." Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004). The defendant's burden is one of production only; the burden of persuasion remains on the plaintiff. Provencher v. CVS Pharmacy, 145 F.3d 5, 10 (1st Cir. 1998).

Where the plaintiff has shown sexual harassment by a supervisor, the employer is not necessarily strictly liable for the supervisor's misconduct. Under Ellerth and Faragher, where a supervisor (here, Cruz) is involved, there are a series of specialized rules and defenses depending on whether there has been a tangible employment action. We recently summarized the rules for cases of actionable discrimination by supervisors:

> (1) An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.
> (2) Where no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.
> (3) No affirmative defense is available when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.
> (4) The affirmative defense, when available, comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. The employer bears the burden of proof as to both elements.

-17-

> (5) As to the first element of the defense, proof of an anti-harassment policy with a complaint procedure available to employees, while not necessarily dispositive, is relevant.
>
> (6) As to the second element of the defense, proof that the employee failed to meet his obligation of using reasonable care is not limited to an unreasonable failure to use such a procedure, although such proof will normally suffice to meet the employer's burden.

Arrieta-Colon, 434 F.3d at 86 (internal quotation marks, ellipses, and citations omitted) (quoting Faragher, 524 U.S. at 807-08).

B.        Sufficiency of the Evidence of Harassment and Retaliation

We review de novo the district court's denial of the defense motions under Rule 50 for judgment as a matter of law. White v. N.H. Dep't of Corr., 221 F.3d 254, 259 (1st Cir. 2000). We review the evidence and draw inferences from it in the light most favorable to the verdict, making no determinations of our own as to the credibility of witnesses or the weight of the evidence, reversing "only if a reasonable person could not have reached the conclusion of the jury." Id. The jury was not asked to distinguish among hostile work environment, other forms of sexual harassment (such as quid pro quo), and retaliation in finding liability under Title VII and Law 17. Each and every potential basis of liability was supported by ample evidence.

1.   Harassment

There are two themes to the defendants' arguments. The first is that the incidents here were too minimal to support a

-18-

hostile work environment or quid pro quo claim as a matter of law. The second is a back-door attack on Valentín's credibility. The second can be quickly dispatched. Credibility of witnesses is simply not a basis for attacking a jury verdict in a sufficiency of the evidence challenge. See id.

As for the first defense theory, the jury, which heard the witnesses, rejected the defense of triviality and, on the facts here, was entitled to do so. The picture painted by the defense focuses on Cruz' comments and argues that any woman, particularly a police officer, could handle them. The defense ignores the conduct of Cruz -- his constant efforts at physical proximity, his repeatedly cruising by Valentín's house, the so-called "chance" meeting at the shopping mall, his leaving a note under the windshield wiper of her car saying she was his. The defense also ignores that the repeated visits of the Commissioner, Cruz, and Ferrer while Valentín was working at the state police station made her so uncomfortable that she was unable to continue working.

The defense ignores that Cruz threatened to and did make compliance with his demands a condition of avoiding punishment at work. He threatened Valentín that she would be "screwed" if she would not react more affectionately to his unwanted advances. The threat was not an empty one. He had already seen to it that she received unfavorable work assignments: he effectively admitted to her at Las Cascadas that her continued posting there was his doing

-19-

(through his and his friend Ferrer's mutual control over the work assignments), and that it could be avoided if she would acquiesce. Valentín was removed from the privileged traffic division and singled out for extra double shifts and for extended posting at Las Cascadas, above and beyond what ordinarily would be expected. And the jury could conclude that Cruz delivered an admonishment letter to Valentín, had his friend Ferrer do the same, and had his friend Vélez simultaneously deliver news of a month-and-a-half-old internal complaint, as a form of reprisal for her refusal to give in to his demands (and as a method of deterring her from complaining to the Commissioner).

## 2.  Retaliation

The Municipality argues that there was insufficient evidence of retaliation.[9]  This argument is without merit.

In October 2000, Valentín engaged in protected conduct by complaining about Cruz' sexual harassment to Norma Gonzalez, attempting to complain to the Commissioner, and complaining to Vélez.  All three were proper people to whom to complain.  And

---

[9] Cruz makes no such argument, apparently on the assumption that his liability under Law 17 must have been based only on sexual harassment.  This might be correct, but is not necessarily so. The jury charge was somewhat ambiguous, and the verdict form even more so; the latter arguably permitted the jury to find Cruz liable under Law 17 for retaliation.  Cruz has not argued that this did not happen, or that if it did, it would have been impermissible. In any event, Cruz' sufficiency challenge fails on the ground he did understand to be implicated: assuming the jury held him liable only on the sexual harassment theory, that finding was amply supported.

beginning in that very same month, Valentín was assigned extra double shifts, removed from her favorable traffic duty, and given an unusually long posting at Las Cascadas, where the work was remote and solitary. The jury could easily regard the totality of these assignments, following swiftly on the heels of her complaints, as well as the disciplinary letters, as adverse employment actions caused by Valentín's complaints.

On February 14, 2001, Valentín said she was going to complain to the Commissioner, and Cruz responded as soon as she arrived by giving her an admonishment letter. When Valentín reiterated her desire to speak with the Commissioner, Vélez gave her a document about an alleged disciplinary problem, and Ferrer gave her another admonishment letter. The letters were adverse employment actions. See Calero-Cerezo, 355 F.3d at 25 (memorandum of admonishment is adverse employment action). The jury could find that they were causally related to Valentín's protected conduct, both in the recent past and as contemplated in the immediate future -- although her stated intentions to pursue the matter that very day never came to fruition, because she was driven past the breaking point by these very tactics.

The Municipality does not, on appeal, address any of these pre-termination incidents. It focuses only on termination. Even assuming this narrow focus to be warranted, it fails.

On February 26, 2001, Valentín filed an administrative complaint about the sexual harassment and retaliation that she had suffered to date. On January 3, 2003, she filed this lawsuit. By the end of that month, she had been terminated.[10] The Municipality says this was not an adverse employment action because it was a "statutory termination" that became "self-executing" when Valentín failed to avail herself of certain procedures under Puerto Rico law. The Municipality relies on P.R. Laws Ann. tit. 11, § 7, part of the Workmen's Compensation Act. That provision provides that an employer must reserve the position of an employee out on disability (as Valentín was here) and reinstate her, provided, inter alia, that the employee demands reinstatement within a year of the date her job-related disability began. Id. § 7(1). The Municipality argues, on the basis of this provision, that Valentín's termination was "statutory" because she took too long to seek reinstatement.[11] The Municipality uses this same argument to say that even if

_____

[10] The Municipality, stressing the timing, argues that the termination was not causally connected to the administrative complaint. But the Mayor conceded at trial that, in signing the termination letter, he took into consideration the fact that Valentín had filed a claim against the Municipality. It is unclear whether he was referring to the administrative complaint or the civil suit, filed less than a month earlier, but the Municipality fails to address this point at all.

[11] The Municipality also argues that the termination "became self-executing" when Valentín failed to contest it "within the time frame prescribed by state law." It is unclear whether this argument is meant to be distinct from the "statutory termination" argument under § 7. In any event, the Municipality cites no additional authority for any time frame other than the one in § 7.

Valentín made a prima facie showing of retaliation, it rebutted that showing by proving that it had a legitimate reason for the termination and that it would have taken the same action in any event, "to comply with" § 7.

Nothing in this provision of Puerto Rico law means that the employer is obliged to terminate an employee, even after a year has elapsed. The Municipality suggests that this provision, meant to protect disabled workers, somehow creates a duty to fire them if they have not requested reinstatement by a certain time, even if the employers are willing to grant extra time. The suggestion that the Municipality had to terminate Valentín "to comply with" this provision, or that hers was a "statutory termination," contravenes the Supreme Court of Puerto Rico's clear policy that the Workmen's Compensation Act "must be liberally construed in favor of those whom it seeks to protect." García Díaz v. Darex P.R., Inc., 148 P.R. Dec. 364, 374 n.11 (P.R. 1999) (certified translation supplied by defendants); see also Rivera-Flores v. P.R. Tel. Co., 64 F.3d 742, 750-51 (1st Cir. 1995). The Municipality was free to reinstate Valentín at any time, whether or not a year had passed.

Although the Municipality did not have to fire Valentín, we assume arguendo that the duration of Valentín's second, extended absence from work could have been a legitimate reason for termination of her employment. Even so, the jury was not compelled

to find that this was in fact the cause of her termination, or that the termination was not an adverse employment action.[12]

C.        Lack of Faragher/Ellerth Jury Instruction

The Municipality argues that the court should have given it the benefit of a Faragher/Ellerth instruction.  The Municipality has taken the position that Cruz was Valentín's supervisor.  It argues that even if the record shows that there was severe and pervasive harassment, there still was no tangible employment action taken against her, and so it was entitled to assert the affirmative defense under Faragher/Ellerth.[13]

The Municipality has not pointed to where in the record it ever requested a Faragher/Ellerth instruction.  Such a request does not appear in the defendants' joint proposed jury instructions, submitted before trial.  In any event, the matter arose before the court instructed the jury, when the court noted that the Municipality's anti-sexual-harassment policy itself was not in evidence.  The court reasoned that this omission meant the

---

[12] The Municipality goes so far as to suggest that Valentín "was not terminated."  This contention is plainly contrary to the record, including the parties' stipulations.

[13] The Municipality goes beyond seeking a new trial.  It claims it was actually entitled to judgment as a matter of law against any liability for Cruz' conduct.  It argues that a properly instructed jury not only might have found, but would have been compelled to find, that the Faragher/Ellerth defense was satisfied.  But in the post-trial motion requesting judgment notwithstanding the verdict and other relief, the defense failed to discuss the Faragher/Ellerth defense at all.  The argument, even if it had been preserved, fails for the reasons stated in the text.

-24-

jury had no way of knowing what opportunities, provided by the Municipality, Valentín had failed to pursue. Counsel for Cruz said "[w]e have no objections [to the court's not giving a <u>Faragher</u> instruction] . . . . We know the manual is not in evidence." Counsel for the Municipality stood silently by, as the Municipality concedes in its reply brief. There were no objections after the jury charge was given.

Valentín argues that the Municipality expressly waived the <u>Faragher/Ellerth</u> defense. The Municipality counters that Cruz' attorney did not speak for it. Although Valentín asserts that there was a work-sharing arrangement under which Cruz' waiver was binding on the Municipality, and it appears that defense counsel did de facto divide up many tasks, she has not pointed to any record evidence of a binding arrangement. We therefore give the Municipality the benefit of the doubt and treat the issue as forfeited, not waived, and we review for plain error. <u>See</u> Fed. R. Civ. P. 51(d)(2).

This means the Municipality must show that an error was committed, that it was plain (meaning obvious), that the error was prejudicial (meaning it affected substantial rights), and that review is needed to prevent a "miscarriage of justice" (meaning that the error "seriously impaired the fairness, integrity, or public reputation of judicial proceedings"). <u>Rivera Castillo</u> v. <u>Autokirey, Inc.</u>, 379 F.3d 4, 10 (1st Cir. 2004) (internal quotation

marks omitted) (quoting <u>Smith</u> v. <u>Kmart Corp.</u>, 177 F.3d 19, 26 (1st Cir. 1999); <u>Muñiz</u> v. <u>Rovira</u>, 373 F.3d 1, 6 (1st Cir. 2004)).

The Municipality does not explain why the failure to give the instruction is plain error, and in any event it cannot make such a showing. Plain error review requires that there be an error. There was none. As this court recently observed, "[w]here the evidence shows that the defendant cannot prove an affirmative defense under the <u>Faragher</u> standard, there is no reason to remand for the giving of a <u>Faragher</u> instruction." <u>Arrieta-Colon</u>, 434 F.3d at 87. Although there was testimony that the Municipality had an anti-sexual-harassment policy, there is no evidence that it was distributed or that employees of the police department knew about it until after several of the crucial events in this case.[14] There is no basis in the evidence that would permit a finding that the Municipality exercised reasonable care to prevent and correct promptly any harassing behavior.

Further, the Municipality has made no case that Valentín unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm

---

[14] Valentín first received a copy of the Municipality's policy in November 2001; she had never, as an employee, attended a seminar where that policy was explained. Ortiz also testified that until 2001, she had never been given a copy of the Municipality's policy. Vélez testified that he did not recall receiving any sexual harassment training from the Municipality before February 14, 2001. The Mayor testified that the policy "should have" been distributed to employees within weeks of its adoption in September 2000, but he did not recall how the policy was actually distributed.

otherwise.  Assuming such opportunities were even open to Valentín, in fact and not just on paper, she pursued them.  She complained -- and attempted to complain -- repeatedly, to several different individuals who were proper people to whom to complain.  She was ignored or worse at every turn.  The Municipality's point that none of her complaints were in writing is a non sequitur in light of its failure to show that complaints had to be in writing.

D.        Due Process Claim

The jury awarded Valentín $125,000 in compensatory damages for the Municipality's failure to comply with her federal due process rights.  The basis of this claim was that Valentín, as a tenured municipal employee, was entitled to a hearing before she was deprived of her employment, and that the Municipality did not provide such a pre-termination hearing.

The Municipality argues that the issue was a pure one of law for the court and it was an error to submit it to a jury.  It argues that Valentín has no due process claim because even if she originally had a property interest in the position as a permanent employee, she lost that interest.  That, it argues, is because as a matter of law, she lost her job by operation of the Workmen's Compensation Act, P.R. Laws Ann. tit. 11, § 7, when more than 360 days -- treated as a year under § 7, see Torres González v. Star Kist Caribe, Inc., 134 P.R. Dec. 1024, 1033 n.4 (P.R. 1994), official translation available at 1994 WL 909600 -- had elapsed

-27-

since she last reported to work; and because this "statutory" discharge became "final and self-executing" when she failed to take an administrative appeal. According to the Municipality, the district court erred as a matter of law in "creat[ing] the impression of voluntary discharge." The argument fails for two reasons: the Municipality never presented it to the district court, and the premise of the argument itself is wrong.

The Municipality did not object to the jury instruction on due process, either before or after it was given. The Municipality says that its failure to preserve the issue as to the jury instructions does not matter, because "this matter was brought up by the Defendants at trial as an issue of law that should have been resolved by the District Court and should have not been an issue for the jury to resolve." The Municipality does not support this claim of preservation at trial with any citations to the record.[15] The Municipality cannot sandbag the court and its opponent by not raising the issue and then saying the court should have seen it.

---

[15] The Municipality may be referring to an argument made by Cruz' attorney in support of a Rule 50 motion at the close of all the evidence. Even assuming Cruz' attorney spoke for the Municipality (contrary to the Municipality's own contentions elsewhere), the argument made was only that if Valentín had sought a hearing or taken an administrative appeal under Puerto Rico law, she could have avoided any damages "even after the 360 days had elapsed." Cruz' attorney did not argue that the Municipality was somehow forced to fire Valentín.

-28-

We have already rejected the Municipality's reading of § 7. "[I]t is merely the employee's absolute right not to be terminated on account of her disability, rather than her property interest in her employment position, which lapses under the one-year workers' compensation 'caducity' provision." Rivera-Flores, 64 F.3d at 750. Valentín did have a property interest in her employment. That interest could not be taken away without the provision of procedural due process, including a pre-termination hearing, the right to which did not lapse automatically on any particular date. See id. at 750-51.

The evidence permitted the jury to find that Valentín had an ongoing property interest in her job and that she was terminated from her job without an opportunity for hearing.[16]

E.        Statute of Limitations Defense as to Law 17

The district court denied the individual defendants' motion to dismiss the Law 17 claims as time barred. Cruz, who

---

[16] The Municipality says the onus was on Valentín to follow certain procedures. It says that under Puerto Rico law, she should have sought a pre-termination hearing within fifteen days. The Municipality does not specify within fifteen days of what event -- presumably of the date Valentín received the termination letter, which is the date her employment ended, as the parties stipulated. A later hearing can hardly have been "pre-termination," and it was the Municipality's duty to provide such a hearing. The Municipality also points to Valentín's failure to appeal her termination to the Puerto Rico agency known as "JASAP" within thirty days. These procedural arguments are waived due to lack of development on appeal. The Municipality cites no authority for the existence, application, or effect of the Puerto Rico procedures said to have been ignored by Valentín.

raises a timeliness challenge on appeal, is affected because Law 17 was the only basis for the damages award against him, and for the doubling of the award.[17]

Under Puerto Rico law, Law 17 claims must be brought within one year. See 29 P.R. Laws Ann. § 155m; Matos Ortiz v. Puerto Rico, 103 F. Supp. 2d 59, 63 (D.P.R. 2000) (collecting cases). Cruz argues that the last act of sexual harassment was in November of 2000, that the statute ran in November of 2001, and that the civil complaint was filed in January of 2003. There are several responses, including the response that Cruz ignores the fact that Valentín also complained of an ongoing pattern of harassment and retaliation well after November 2000.

In order to resolve what may be a recurring issue, though, we focus on the legal ground used by the district court to reject Cruz' argument. The court held that Valentín tolled the statute of limitations on the Law 17 claim when she filed her administrative complaint on February 26, 2001, because the complaint contained "the identical cause of action" as that later raised in the civil suit.

Under Puerto Rico law, the statute of limitations is tolled by a plaintiff's extrajudicial claim. P.R. Laws Ann. tit. 31, § 5303. "The tolling is effective with regard only to

---

[17] The Municipality is affected by Law 17, which doubled a portion of the compensatory damages award, but it does not raise a timeliness challenge on appeal.

-30-

identical causes of action." <u>Benitez-Pons</u> v. <u>Puerto Rico</u>, 136 F.3d 54, 59 (1st Cir. 1998) (internal quotation marks omitted) (quoting <u>Rodriguez Narvaez</u> v. <u>Nazario</u>, 895 F.2d 38, 43 (1st Cir. 1990)). The relief sought in the extrajudicial claim must be the same as that later sought in court. <u>Id.</u> at 59-60.

Cruz argues that, as a matter of law, Valentín's "charge before the EEOC" cannot be identical to the district court complaint against him, because it is doubtful there can be a Title VII complaint against an individual.[18] Because a cause of action against him could not have been brought under Title VII, he says, the EEOC complaint could not have been identical with, and did not toll the statute of limitations on, Valentín's Law 17 claim against him.

Cruz' entire argument rests on the premise that Valentín's administrative claim was originally brought before the EEOC under Title VII exclusively. This premise is incorrect. The claim was originally filed before the Anti-Discrimination Unit of

---

[18] This court has not decided the issue of whether Title VII liability can be imposed on individuals and need not do so here. Precedent in the District of Puerto Rico, which Valentín does not challenge, bars Title VII liability against individuals. <u>Maldonado Cordero</u> v. <u>AT&T</u>, 73 F. Supp. 2d 177, 184 (D.P.R. 1999).

the Puerto Rico Department of Labor,[19] and it was not brought exclusively under Title VII.

Valentín listed Cruz among those who had discriminated against her. She alleged, inter alia, that she had been the victim of sexual harassment and reprisals by Cruz. Valentín's cause of action under Law 17 is identical to that raised in the administrative complaint. The administrative charge does not explicitly cite any law -- Title VII, Law 17, or otherwise. But except for the fact that Law 17 expressly allows for individual liability, see P.R. Laws Ann. tit. 29, §§ 155a, 155d, 155j, Puerto Rico interprets Law 17 as congruent with Title VII. The administrative complaint stated all the elements necessary for a Law 17 claim and put Cruz on notice of the discrimination claim against him, as an individual. As for remedy, Valentín asked for various forms of relief, including compensatory damages -- the same thing she sought from Cruz in the civil suit.

This was enough to toll the statute of limitations. The tolling effect continued until the conclusion of the administrative proceeding. See Rodríguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 61 (1st Cir. 2005). Here, that conclusion was no

---

[19] The parties have not briefed the issue of whether Law 17 actually requires the filing of a prior administrative claim. It appears there may be no such requirement. See P.R. Laws Ann. tit. 29, § 155l ("It shall not be necessary to exhaust all administrative remedies for the purpose of initiating judicial procedures under §§ 155-155l of this title.").

-32-

earlier than April 1, 2002, the date on which the EEOC issued a determination that there was reason to believe the alleged sexual harassment and retaliation had in fact occurred.  Valentín had a year from that date (and arguably from a later date, for reasons which are unnecessary to elaborate here) to file this lawsuit, and she did so with months to spare.[20]  See Rodriquez Narvaez, 895 F.2d at 43 (stating that "the statute of limitations begins to run anew" when the tolling ends).

F.          Remitittur

Defendants argue that the damages awarded are duplicative and in any event excessive.

The Municipality argues that the compensatory damages award is duplicative in two senses:  there is an overlap between the Title VII and Law 17 claims and, second, there is an overlap between the due process claim and the Title VII/Law 17 claims.  In

---

[20] The Municipality, as already stated, does not make a timeliness argument.  Individual liability aside, it seems clear that the filing of an administrative complaint before either the Puerto Rico Department of Labor or the EEOC would have been sufficient to toll the Law 17 statute of limitations.  Either is sufficient under Puerto Rico's Law 100.  See Rodriquez-Torres, 399 F.3d at 61.  This same rule applies to Law 69, and there is no reason to think the rule should be different for Law 17.  See id. (noting that both Laws 69 and 100 "serve the purpose of combating gender discrimination in employment," that "Law 69 is merely an amplification of the principles contained in Law 100," and that the Puerto Rico Supreme Court would probably apply the tolling rules of Law 100 to Law 69); Matos Ortiz, 103 F. Supp. 2d at 64 (making same observation as to Laws 17, 69, and 100, and concluding that "Law 17 and Law 69 are . . . to be interpreted in pari materia with Law 100").

the Municipality's view, Valentín was awarded damages for the same basic harms -- sexual harassment and eventual termination -- multiple times, under different legal theories.

The Municipality concedes that to the extent damages are properly awarded under Law 17, they are subject to mandatory doubling.  See P.R. Laws Ann. tit. 29, § 155j(1).  As to any possible overlap in damages between or among the Title VII, Law 17, and due process claims, in this circuit, the primary mechanisms to avoid impermissible duplicate awards for damages are the jury instructions and the structure of the verdict form.  "To the extent that a jury award on both claims would be duplicative, the proper practice is to ensure that the verdict form is structured so as to allow the jury to recompense the plaintiff['s] injuries just once." Acevedo-Garcia v. Monroig, 351 F.3d 547, 569 (1st Cir. 2003). Defendants should request instructions clearly directing the jury to compensate the plaintiff's injuries just once.  Id. at 570.

Once again, this is a defense which was given away at trial.  The Municipality concedes that it never objected at trial to the proposed verdict form or to the court's failure to charge the jury as to any possible overlap.  Nor did it raise the argument after the jury returned the verdict and before the jury was discharged and the judgment was entered.  In the post-trial motion seeking remitittur or a new trial, there was no argument as to

-34-

duplication; the only argument raised was that the damages were simply "excessive" in light of the evidence.

The Municipality falls back, in its reply brief, on plain error review. See id.; Chestnut v. City of Lowell, 305 F.3d 18, 20 (1st Cir. 2002) (en banc). But it still does not explain how the doctrine helps it. That argument is waived for lack of appellate development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

We turn, then, to the claim that, aside from any possible duplication, the sums awarded were simply too great in light of the evidence. Even if we viewed the award as quite generous, that is not the test. The award will not be overturned unless it is grossly excessive or so high as to shock the conscience of this court. O'Rourke, 235 F.3d at 733. Further, "[w]e accord broad discretion to the trial court's decision to affirm the jury's award of damages because of that court's greater familiarity with local community standards and with the witnesses' demeanor at the trial." Brown v. Freedman Baking Co., 810 F.2d 6, 11 (1st Cir. 1987).

There was, to begin with, evidence of serious economic damages. Valentín was wrongfully deprived of her salary, both when she was driven by defendants' conduct to take disability leaves, and later when she was terminated outright.[21] Moreover, while she

_____

[21] The jury could have determined that Valentín suffered $705,000 in total damages -- with no duplication whatsoever -- and then divided that amount among the various spaces on the verdict

-35-

was out of work, she lost her house and her car, and she and her children were forced to move into an abandoned house.  Cf. Acevedo-Garcia, 351 F.3d at 571 (jury may consider "secondary economic injuries flowing from the plaintiffs' loss of earnings").  Because of these damages and because of the harassment and threat of reprisals, Valentín suffered various forms of emotional damages and mental anguish, including, inter alia, insomnia, anxiety, guilt, and depression.  The jury could believe this suffering was real and severe, based not only on Valentín's testimony that it was, but also on the fact of the nervous breakdown and the fact that she received extended psychological treatment from the SIF.  See O'Rourke, 235 F.3d at 733-34 (upholding award based on similar emotional distress, and collecting cases).  There was ample evidence that it was defendants' own continued and varied misconduct which caused the harms suffered by Valentín.  The award was not excessive.

Cruz adds his own argument that even if he harassed Valentín, it was only from August of 2000 to November of 2000, or at most to February of 2001, and she did not suffer any financial damages or adequately proven emotional distress during this time.  The argument ignores both the ample evidence of emotional damages during that very period and the fact that the evidence supported a

form.  The defense has not shown that such apportionment did not occur or, if it did occur, that it was impermissible.

conclusion that Cruz instigated and participated in later harassment and retaliation. More fundamentally, Cruz' artificial time limit is based on the mistaken legal premise that a defendant is not liable for damages which flow from his own actions in violation of law and are reasonably foreseeable. See P.R. Laws Ann. tit. 29, § 155j(1) (person responsible for harassment is liable for "the damages that the action has caused," plus mandatory doubling) (emphasis added).

G.          Denial of Motion for New Trial

Decisions by the trial court to deny a motion for a new trial are reviewed for abuse of discretion. Arrieta-Colon, 434 F.3d at 89. Trial judges have more leeway to grant new trials than to set aside verdicts based on insufficiency of the evidence under Rule 50. They may consider their view of the credibility of the witnesses in doing so, but must be careful not to invade the jury's province. See MacQuarrie v. Howard Johnson Co., 877 F.2d 126, 132 (1st Cir. 1989). And they may grant a new trial only if they are convinced that the verdict is against the clear weight of the evidence, such that letting it stand would result in a miscarriage of justice. Arrieta-Colon, 434 F.3d at 89; O'Rourke, 235 F.3d at 726. Given our account of the evidence supporting liability and

damages, and the absence of any error at trial,[22] the trial judge certainly did not abuse her discretion in denying a new trial.

H.            Reinstatement

We review a district court's decision to award equitable relief for an abuse of discretion. Selgas v. Am. Airlines, Inc., 104 F.3d 9, 12 (1st Cir. 1997). We review deferentially, keeping in mind the purposes of the relevant constitutional and statutory provisions, such as Title VII's "dual purposes of eliminating discrimination and making its victims whole." Id.

The Municipality argues Valentín was not entitled to reinstatement, largely on the basis of its theory that Valentín's claim to her job automatically expired as a matter of law.[23] Our earlier discussion disposes of that.

A second argument is made that a federal court, remedying a violation of a federal employment statute, may not order reinstatement because a state agency -- here, the Puerto Rico

---

[22] The defendants argue that the verdict should be reversed because the district court did not let Valentín's ex-husband testify that Valentín had trumped up charges against him. They argue that this was relevant to her state of mind; it showed her to be a habitual liar who staged a nervous breakdown. There was no abuse of discretion in excluding this improper evidence.

[23] The Municipality quotes the Puerto Rico Supreme Court's statement that if a worker is discharged by SIF before the one-year term elapses and "does not apply for reinstatement under [§7], the employer is liberated from his obligation to reserve the employment." García Díaz, 148 D.P.R. at 378 (certified translation). Of course, Valentín did not claim reinstatement based solely on § 7 itself, but rather relied on her federal rights.

agency known as JASAP -- has exclusive jurisdiction over a personnel claim. Not surprisingly, there is no support offered for the Municipality's confusion of basic principles. The Municipality cites a statute, P.R. Laws Ann. tit. 3, § 1334, which does not establish JASAP's exclusive power at all. It also relies on Baez-Cruz v. Municipality of Comerio, 140 F.3d 24 (1st Cir. 1998), a political discrimination case, which lends no support to the Municipality's position. The plaintiffs in Baez-Cruz lost before JASAP, which found that their dismissals were not politically motivated, and the Puerto Rico Supreme Court affirmed. Id. at 26-27. This court held that Puerto Rico's issue preclusion doctrine ended the matter for purposes of the lawsuit in federal courts. Id. at 29-31. Here, of course, there can be no argument that Valentín is collaterally estopped by any factual finding of JASAP or the Puerto Rico courts. Baez-Cruz did not in any way limit the principle that Congress specifies the remedies for violation of federal law such as Title VII and has not ceded that power to the states or to Puerto Rico.[24]

The district court took into account the requisite equitable considerations, including the fact that Valentín's

---

[24] To the extent the Municipality is arguing that JASAP has exclusive initial jurisdiction over reinstatement claims, and that a plaintiff bringing an action under federal law in federal court must first exhaust Puerto Rico administrative remedies, such a theory is no better supported by § 1334 and Baez-Cruz than the theory rejected in the text.

original hiring was valid, that she met the eligibility requirements for her job, and that she had not found comparable work. The Municipality cites not a single equitable factor in support of its position. There was no abuse of discretion in the decision to order reinstatement, which is, after all, the preferred remedy under Title VII. <u>Selgas</u>, 104 F.3d at 12.

### III.

The judgment is <u>affirmed</u>. Costs are awarded to plaintiff.