Olivia HALL

v.

**FMR CORPORATION and
Neil Goulding.**

Civil Action No. 07–CV–12307–RGS.

United States District Court,
D. Massachusetts.

Oct. 30, 2009.

Paul H. Merry, Attorney at Law, Boston, MA, for Olivia Hall.

John T. McCarthy, Christopher W. Sanzone, Sanzone & McCarthy, Wellesley, MA, for FMR Corporation and Neil Goulding.

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEARNS, District Judge.

### BACKGROUND

On October 31, 2005, Olivia Hall resigned from defendant FMR Corporation (FMR)[1], a national financial services firm, because of "health and emotional problems" that she attributed to "differential treatment." The facts (with those not disputed construed in the light most favorable to Hall) are as follows.

Hall, who was born in Honduras, is of African descent. She has worked in the financial services industry for more than twenty years. Her area of expertise is in stock options. In 1991, Hall began working for National Financial Services, LLC (NFS), an affiliate of FMR. In 2001, Hall transferred to a Senior Operations Specialist position within NFS's Registered Investment Advisory Group (RIAG) in Smithfield, Rhode Island. In June of 2004, RIAG underwent a reorganization. Most of RIAG's operations were moved to

---

1. FMR, originally called Fidelity Management and Research Company, was incorporated in 1946, and in November of 2007 became FMR LLC. FMR LLC is the umbrella company for the holdings of Fidelity Investments, one of the world's largest mutual fund companies. Ross Kerber, *Fidelity changes it corporate structure; Conversion to LLC could save millions for firm, boost profits*, Boston Globe, Nov. 3, 2007.

Covington, Kentucky. As a result, Hall's position was eliminated.

In the wake of the reorganization, NFS's human resources department held several meetings to inform displaced RIAG employees of other job opportunities within the FMR family, including positions available in a newly-established Correspondent Middle Office Group (CMOG). After conducting interviews, Paul Mincone, the Director of the CMOG (and Goulding's direct supervisor), offered Hall and six other associates Senior Operations Specialist positions. The jobs were based in Smithfield, Rhode Island. Mincone chose Goulding to manage the new Operations Group.[2]

The Operations Group was responsible for supporting client brokerage requests. Operations Specialists processed client transactions, maintained accounts, and tracked employee stock options (ESOPs). The Operations Specialists also worked with the CMOG Client Service team in resolving client issues. *See* Goulding Aff. at ¶ 4; Mincone Aff. at ¶ 14.

In her prior job, Hall had been primarily responsible for processing ESOPs. She enjoyed the work. Goulding gave her the same assignment in the Operations Group. The processing work involved multiple steps (Hall testified to a minimum of nine) and was time-consuming.[3] While Hall was designated as the primary contact for ESOP work, Goulding and Mincone expected her to handle other transactions, "particularly given the low volume of ESOPs received by the CMO[G]." Goulding Aff. at ¶.11; Mincone Aff. at ¶ 17.

NFS used a workflow software application called "XTRAC" to automate the routing and tracking of client requests. Goulding Aff. at ¶ 13; Mincone Aff. at ¶ 18. Under NFS's system, clients would fax or mail requests to FMR's Covington facility. The client request would be scanned into the XTRAC system and a work item would be created. The work item and image of the paper request would then be linked together and routed to the CMOG for processing. Goulding Aff. at ¶ 15. There, members of the Operations Group would be assigned items waiting to be processed in the XTRAC queue. Occasionally, clients would submit requests directly to the CMOG. If the request involved an ESOP, it would be routed to Hall or her alternate, Melissa Bartlett. As with the requests generated through the Covington facility, Hall was required to create a work item in XTRAC. FMR states that the XTRAC entry was essential to ensure that

2. Hall was acquainted with Goulding, but had not previously worked with him. According to Hall, prior to August of 2004, her relationship with Goulding was cordial. Hall Dep. at 53. However, upon learning that Goulding had been selected as her new manager, Hall was concerned that he would not treat her fairly. *Id.* at 50–51. Hall testified that her concern arose from her perception that Goulding was close to another manager, Nazem Azzi, who had reportedly made the comment that "employees should not be fooled by [Hall's] many years of experience because she did not know what she was doing." *Id.* at 44–46. At her deposition, Hall testified that she "did not know" whether Azzi made the comment because of her race. *Id.* at 44–46, 51. Hall contacted Philip Hicks, the FMR Director of Human Resources Solutions (HRS), to express her unease about the relationship between Goulding and Azzi. Hicks told Hall that she should wait to see how things went with Goulding and that she should contact HRS if any problems arose. *Id.* at 50–51.

3. Hall and FMR dispute the amount of ESOP processing work that was handled by the CMOG. FMR claims that ESOP transactions accounted for a very small percentage of the work (Mincone Aff. at ¶ 16; Goulding Aff. at ¶ 5), while Hall claims it was a "significant percentage." Plaintiff's Response to SOF ¶ 39.

client requests were stored and retained, that employees received proper credit for processing transactions, and that managers had the ability to monitor the volume and timely processing of transactions.

In 2004, FMR implemented two programs that utilized XTRAC to quantify its goals. OSG 50 was a program instituted to achieve a 50 percent improvement in accuracy, quality, accountability, and cycling time for processing of transactions. Senior management began a related initiative to ensure that the CMOG was pricing transactions appropriately and that the price for each transaction accurately reflected the amount of time expended by employees. To that end, in or around the fall of 2004, FMR introduced a software program, E–Time, to track employee work time. By cross-referencing the number of work items entered into XTRAC with the processing time logged into E–Time, managers could identify a per-hour processing rate for each employee.[4] At the end of each month, scorecards were created for the members of the Operations Group and reviewed by Goulding (a practice instituted by his predecessor).

From August 2004 through June 2005, Hall received satisfactory reviews crediting her knowledge regarding the processing of ESOPs. *See* Goulding Aff. at ¶ 85. However, the monthly scorecards indicated that the number of transactions processed by Hall was consistently lower than that of her co-workers. *Id.* at ¶ 86. Hall contends that "much" of her ESOP work was

not recorded on XTRAC "in contrast to her white counterparts whose work [mostly non-ESOP-related] was automatically recorded by the system." Hall states that she regularly assisted the Client Services team in answering client questions and special requests. She also on occasion took work from others who were logged into the system for which she was not credited. Despite her "repeated efforts over many months," Hall blames FMR for failing to accurately credit her work time. Consequently, she was "undervalued" and given "inaccurate and misleading performance evaluations."

According to Goulding and Mincone, it was the responsibility of each employee to ensure that his or her work was recorded and captured in E–Time and XTRAC. At her deposition, Hall conceded that she did not always record the time that she spent on ESOPs and other transactions even though the system would have permitted her to do so. Hall said that because of the heavy workload, entering the information into XTRAC "was too much for her." Hall Dep. at 68–72, 77–80, 176–188. Hall further testified that she did not log all of her calls into E–Time because she "would have to work there until midnight." *Id.* at 77.

On September 7, 2004, Goulding sent an email to the members of the Operations Group offering NFS sponsorship to sit for the Series 7 exam.[5] On December 16, 2004, Goulding sent a second email announcing that the CMOG planned to sponsor additional candidates for the Series 7

---

4. Goulding expected his associates to process 8–12 cashiering/maintenance items or 7–10 new accounts per hour. Goulding Aff. at ¶ 29.

5. The Series 7 license is the most comprehensive of several securities licenses that permit an agent to communicate with retail investors and is a prerequisite to becoming a Registered Representative of a broker-dealer in the

United States. Individuals who pass the Series 7 are eligible to register with all self-regulatory organizations to trade. *See* www. sec.gov/answers/ series7.htm (last visited Oct. 29, 2009). To obtain this license, an individual must pass the General Securities Representative Exam administered by the Financial Industry Regulatory Authority. *See* SOF at ¶ 151.

exam. Hall did not respond to either email.

Goulding customarily held bi-weekly meetings of the Operations Group. During these meetings, Goulding would announce special projects. Many of these projects related to business initiatives taken in connection with OSG 50 that were intended to make the work of the CMOG more efficient. Hall never expressed interest in participating in any of the projects. *See* Goulding Aff. at ¶¶ 100–101. Nonetheless, like other Operations Group employees, Hall was at times assigned to work on special projects. Goulding emailed Hall on November 1, 2004, asking her to analyze whether certain types of work requests could be treated as a single request under XTRAC. *See Id.* at ¶ 55. On December 27, 2004, Goulding sent Hall a follow-up email, asking whether she had completed the assignment. Hall responded with her recommendations on December 30, 2004. *See* Hall Dep. at 403–405. Goulding Aff. at ¶ 56. Goulding testified that the delay persuaded him that Hall "was not particularly interested" in taking part in special projects. *Id.* at ¶ 57.

On February 28, 2005, Harry Facher, the Senior Vice President of the Operations & Services Group (OSG), introduced a new associate talent profile. Facher requested that all associates complete the profile by March 15, 2005. The profiles were used by management to identify employees who might have the potential to advance within FMR. *See* Mincone Aff. at ¶ 47; Goulding Aff. at ¶ 75. On March 3, 2005, Mincone sent an email to CMOG employees stating that NFS planned to expand the number of supervisory and senior positions in the CMOG. Mincone advised associates that NFS would not give consideration to employees who did not complete the talent profile.

Although Hall received and read the email, she did not submit a profile. On March 15, 2005, Mincone informed Hall by email that "he wanted to speak favorably on her behalf at the upcoming senior management meetings but that it would be difficult to do so without the [profile] form completed." Mincone gave Hall an extension to submit a profile. Hall told Mincone that she did not want to submit a profile because she had no desire to relocate. Mincone replied that completing the profile would not lead to a relocation, and that NFS had no plans to move the CMOG. Despite these assurances, Hall refused to complete the form.

When asked by Facher to explain why Hall was the only CMOG associate who did not complete the profile, LauraLynn Morrissey, the OSG Vice President of Client Services, responded by email stating that

my perspective is that she is bristling from new found accountability....I have asked the team to monitor processes and actively manage each and every associate's productivity.... Olivia has indicated that she is interested in pursuing opportunities outside of the organization. With the way we are developing the group with Neil Goulding, Nazem Azzi and Paul Mincone actively overseeing details as closely as they are, she is uncomfortable with the level of accountability ... she is probably doing the best thing by looking elsewhere.

Morrissey Aff. at ¶ 11.

When Hall first reported to Goulding in late August of 2004, the normal business hours for the Operations Group were 8:30 a.m. to 5:00 p.m. Hall informed Goulding that her previous supervisor had agreed to a 9:30 a.m. start time because of the length of her commute and her need to drive her children to school. Goulding permitted Hall to continue on this schedule. In late 2004, Morrissey observed that a number of

CMOG employees (including Hall) were reporting late for work. *See* Goulding Aff. at ¶ 61. She asked Goulding to address the issue. *Id.* at ¶ 62. *See also* Mincone Aff. at ¶ 43; Morrissey Aff. at ¶ 3.

At a team meeting of the Operations Group on December 29, 2004, Goulding announced that he was implementing a new policy regarding working hours. Under the new policy, associates were expected to adhere to FMR's standard 8:30 a.m. to 5:00 p.m. work day and that excessive tardiness would not be tolerated. Goulding invited employees to speak with him privately if the new policy caused personal hardship. Goulding Aff. at ¶ 63. Immediately following the meeting, Hall called HRS to complain about the changes. Hall Dep. at 97–99. The following day (December 30, 2004 at 5:43 p.m.), Hall sent Goulding an email asking him the effective date of the new policy. Goulding responded on Monday January 3, 2005, that the new policy was in effect as of that day.

Hall then emailed a complaint to Ann Marie Rogers at HRS. She also asked Rogers if she could apply for a flexible work schedule. *See* Rogers Aff. at ¶ 4. When Goulding later attempted to discuss the issue, Hall told him that he could "not come in and change everything." She also said that she was unable to comply with the new work hours policy. *See* Goulding Aff. at ¶ 66. She then contacted Morrissey to ask why the policy had been implemented. Morrissey explained that it was part of an effort to better manage the Operations Group and that Hall was not being singled out, as the policy applied equally to everyone. *See* Morrissey Aff. at ¶ 4. Shortly thereafter, Goulding informed Hall that she could apply for a flexible work schedule and that he would permit her to

continue to report to work at 9:30 a.m. Goulding gave Hall a copy of FMR's flexible work hours application. *See* Goulding Aff. at ¶ 67.

On January 5, 2005, Rogers spoke with Hall regarding her earlier email complaint. During this conversation, Hall informed Rogers that Goulding had given her the application form, but that she was "stressed out" and unhappy with her job in the Operations Group and was going to "look elsewhere." Rogers Aff. at ¶ 5. Nonetheless, on January 7, 2005, Hall submitted the flexible work hours application to Goulding who then approved it. *See* Hall Dep. at 104–105. Hall was the only employee in the Operations Group who received approval to work a flexible schedule (9:30 a.m. to 6:00 p.m.). Prior to implementing the new policy, Goulding had permitted another employee, who is white, to also report to work at 9:30 a.m. After the new policy took effect, the white employee was required to report at 8:30 a.m. *See* Goulding Aff. at ¶ 73.

Despite the flexible schedule, Hall continued to compile incidents of tardiness. In addition, by July 1, 2005, Hall had used up all of her available annual vacation days. *See id.* at ¶ 93. Goulding nonetheless never disciplined Hall for tardiness or excessive absenteeism.[6] *See* Hall Dep. at 108–109. As a "heads up," Goulding informed Hall that Morrissey had observed her coming in late on April 15, 2005. *Id.* at ¶ 94.

In 2005, Operations Group members received performance evaluations for the period July 1, 2004, through June 30, 2005. In preparing the evaluations, Goulding reviewed each employee's E–Time entries and scorecards. The monthly scorecards

---

**6.** On November 14, 2004, Goulding issued a verbal warning to a white employee because of her excessive absenteeism and tardiness and placed her on probation for the remainder of 2004.

revealed that Hall's total volume of work items was well below that of her peers. Goulding rated Hall's overall performance as "P"—proficient—and entered the following remarks about her performance:

- She has received a 100% quality score for her items that were sampled. Great Job on Quality!
- Olivia's cashiering quality was outstanding in 2004/2005. Her in-depth knowledge of cashiering and ESOP processing remains a key strength to her performance. Olivia has also done a great job in April–May in processing cashiering QC items.
- Olivia and the entire Operations team did an outstanding job on cycle time and collectively reached [a stated] goal.
- Olivia has successfully handled escalations for both Advisor and CMO clients throughout the year.
- Olivia's strengths include her quality of work and her vast knowledge of the cashiering and ESOP functions. She has clearly demonstrated two of OSGs "ASAP" cornerstones: Accuracy and Passion for Service. Her accuracy has been outstanding and she clearly cares about our Clients.

Goulding Aff. at ¶ 119. The review also included the following critical comments:

- However, Olivia's productivity (volumes) fell behind her peers in cashiering, total work items, and pro-active call outs. We are looking for improvements in these areas during the rest of 2005. To help Olivia with this, the management team is currently evaluating the ESOP process so that it becomes more efficient and measurable. We need Olivia's help to be successful in this area.
- We would like to see Olivia increase her participation in our department's

continuous process improvement efforts and momentum toward OSG 50. Olivia's in depth knowledge of our business would certainly benefit our strategic initiatives. We feel that there is currently a great opportunity to enhance the current ESOP model for both our Clients and OSG. We will be working with Olivia on this important process improvement.

- To date, Olivia has not embraced the opportunity to demonstrate team leadership (or perform supervisory duties).
- We would like to see Olivia increase her CMO[G] productivity numbers while sustaining her high levels of quality. We would also like to see Olivia increase her participation, visibility, and leadership on our team and within our strategic initiatives.

Goulding Aff. at ¶ 120. Hall was upset with the review and responded to Goulding that, "I totally disagree with this review and have serious concerns regarding it, and will address them with HR Solutions. This has been by far the worst review I have ever had in my 14 years at Fidelity. As a manager, you should make sure the numerous items I work on everyday are captured." *Id.* at ¶ 121.

In 2004–2005, all job titles within the CMOG were assigned a grade level with an associated salary range. FMR did not permit an employee's salary to exceed the maximum salary associated with his or her grade level. Hall was classified at grade level 14. In 2004, her salary was $10,000 higher than the next best paid member of the Operations Group, and as much as $20,000 higher than the members at the lowest grade. Because Hall had refused to complete the talent profile, Morrissey recommended that she not receive a merit raise in 2005. Goulding, however, disagreed and awarded Hall a 1.5 percent salary increase. Hall's salary was then

$50,746.67 ($550 less than the 2005 salary cap for grade level 14 of $51,300).[7] Goulding Aff. at ¶¶ 39, 147, and Ex. K.

Members of the Operations Group were also eligible to receive semi-annual bonuses for work "which advanced the goals of the business and went above and beyond their job duties." Goulding Aff. at ¶ 48; Mincone Aff. at ¶ 37. Goulding recommended Hall for the third highest bonus award in the Operations Group for the second half of 2004. Goulding Aff. at ¶ 53; Mincone Aff. at ¶ 42.

Despite Goulding's approval of Hall's request for a flexible work schedule, she "notice[d] that she was treated differently from other employees ..., particularly compared to the treatment accorded white male employees." Amended Complaint at ¶ 22. According to the Amended Complaint, white males were given preference in "work assignments, compensation and salary increases, personal perquisites and privileges, [while] more intense supervision [was given to] Ms. Hall than white, male employees." Id. at ¶ 23. As an example, Hall alleges that white and/or male workers received flexible work schedules.[8] She also alleges that she failed to receive "credit" for her "business and professional accomplishments," unlike her white male co-workers. Id. at ¶¶ 24–26.

On October 29, 2004, Hall called HRS to report a "communications problem" with Goulding. Hall spoke to Rogers, who offered suggestions as to how she might improve her relationship with Goulding. Hall requested that Rogers not discuss the issue with Goulding or Mincone because she wanted to address it herself. See Hall

Dep. at 217–218, 425; Rogers Aff. at ¶ 3. On July 28, 2005, Hall contacted HRS to complain about her 2005 mid-year evaluation. As Rogers was on vacation, Hall spoke to a Mary Anderson. Hall states that Anderson asked her to postpone a meeting she had scheduled with Goulding until after Rogers had been consulted. Later that day, Hall emailed Mincone to tell him that she did not want to meet with Goulding until she had spoken further with HRS. See Hall Dep. at 202–203.

Hall states that the "differential treatment" impacted her health, resulting in insomnia, depression, and anxiety, all of which had a "negative impact on her relationships with her children and her spouse." Amended Complaint at ¶¶ 36–38. Hall sought medical advice and treatment "in or before summer and autumn of 2005." At some point in "mid-autumn" of 2005, Hall states that her physician advised her to quit her job at FMR unless "treatment of her improved." Id. at ¶ 40. According to Hall, she then informed FMR that she would leave "unless her working conditions improved." Id. at ¶ 41.

Hall resigned from FMR on October 31, 2005. She "update[d] [FMR's agents] on her differential treatment up through the time when health problems compelled her to cease working and for several months after." Id. at ¶ 34. She also "continued to pursue FMR's Employee Issue Resolution Process" through an unspecified date in "early December, 2005." Id. at ¶ 35. On December 13, 2005, an FMR "agent" informed Hall that "[FMR] did not intend to take further action regarding her complaint."[9] Id. at ¶ 46.

---

7. The salary cap notwithstanding, Hall argues that she was the lowest paid member of the team when the total salary of each team member is divided by his or her years of experience. See Opposition SOF, at ¶¶ 210, 214.

8. The allegation is rather odd in that Hall herself had asked for and had been given a flexible work schedule.

9. In her filing with the Massachusetts Commission Against Discrimination (MCAD), Hall

Hall alleges that she "timely filed her complaint with the MCAD." *Id.* at ¶ 47. The MCAD dismissed Hall's charge on August 24, 2007. In a four-page decision, the MCAD stated that it lacked jurisdiction over the matter because of Hall's failure to file a charge within the statutorily prescribed 300 days.[10] *See* Mass. Gen. Laws ch. 151 B, § 5. Hall appealed. On September 27, 2007, the MCAD held a preliminary hearing. On October 5, 2007, the MCAD issued an order affirming the dismissal of Hall's charge. On December 20, 2007, Hall filed this action in the Massachusetts Superior Court.[11] Defendants removed the case to this court on December 17, 2007.

On December 21, 2007, FMR moved to dismiss the bulk of Hall's Complaint. FMR argued that Hall's discrimination and retaliation claims—Counts I, II, IV, and V of the Complaint—had not been timely-filed with the MCAD, and that Hall's negligence claims (Counts VI and VIII) were preempted by Mass. Gen. Laws ch. 151 B and the state Workers' Com-

---

identified the FMR agent as David Johnson, the Vice President of Employee Relations.

10. A plaintiff must file an administrative charge with the MCAD "within 300 days of the occurrence of the alleged harassing or discriminatory event or events." Mass. Gen. Laws ch. 151B, § 5. The failure to file a timely charge with the MCAD requires the dismissal of any subsequent lawsuit. *See Davis v. Lucent Techs., Inc.*, 251 F.3d 227, 231 (1st Cir.2001); *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 531 n. 11, 750 N.E.2d 928 (2001). Hall states that she first become aware of the "differential treatment" in August of 2004. She then "contacted someone in FMR['s] Human Resources department and thereafter met with her supervisor sometime in August of 2005." Hall resigned from FMR 354 days before filing her MCAD charge on October 6, 2006. The only discriminatory act alleged by Hall within the 300-day limitations period occurred on December 13, 2005, when an FMR "agent" told Hall that "FMR did not intend to take further action" on Hall's internal complaint. As a matter of law, the communication of FMR's decision not to pursue Hall's internal complaint does not constitute a discriminatory act. *See Sharp v. Gen. Motors Acceptance Corp.*, 2005 WL 3455850, at *4 (N.D.Ga. Dec. 16, 2005) (rejecting the argument that an employer's alleged failure to remedy a supervisor's pre-limitations period conduct constituted an "act" of harassment extending the filing period for an employee's administrative charge); *Cooper v. Wyeth Ayerst Lederle*, 106 F.Supp.2d 479, 489–490 (S.D.N.Y.2000) (employer's alleged failure to adequately address plaintiff's harassment complaints did not itself constitute an act of harassment for statute of limitations purposes). *See also Janikowski v. Bendix Corp.*, 823 F.2d 945, 947 (6th Cir. 1987) ("[R]epeated requests for further relief from a prior act of discrimination will not set the time limitations running anew."); *Goldman v. Sears, Roebuck & Co.*, 607 F.2d 1014, 1018–1019 (1st Cir.1979) (repeated requests for further relief addressing a prior act of discrimination do not create a "continuing" violation for statute of limitations purposes). The court agreed with the MCAD that Hall's circumstances did not fit into any of the three exceptions to the 300-day limitations period set out in 804 C.M.R. 1.10(2).

11. Hall's Complaint consisted of the following claims: Count I—Discrimination under Mass. Gen. Laws ch. 151 B (race); Count II—Discrimination under Mass. Gen. Laws ch. 151 B (national origin); Count III—Discrimination under 42 U.S.C. § 1981 (race, color, and national origin); Count IV—Discrimination under Mass. Gen. Laws ch. 151 B(sex); Count V–Retaliation under Mass. Gen. Laws ch. 151 B; Count VI—Negligent supervision and retention; Count VII—Intentional interference with an advantageous business relationship; and Count VIII—Negligent failure to investigate discrimination. While Hall fails to articulate which claims apply to Goulding specifically, he argues that based on the language of the Complaint only Counts II and VII are directed at him personally. This seems to be true. The court notes that Count VII could not have been brought against FMR in any event. *See Saint Louis v. Baystate Med. Ctr.*, 30 Mass.App.Ct. 393, 404, 568 N.E.2d 1181 (1991) (employer cannot be liable for tortious interference in the employment relationship with its own employee).

pensation Act. Finally, FMR argued that Hall's section 1981 claim of national origin discrimination failed as a matter of law.[12] The court largely agreed with FMR in a Memorandum and Order dated June 19, 2008. The court, however, denied FMR's motion to dismiss Hall's claim of tortious interference with an advantageous business relationship against Goulding. *See Charland v. Muzi Motors, Inc.*, 417 Mass. 580, 586, 631 N.E.2d 555 (1994).

Hall filed an Amended Complaint on July 3, 2008, reduced to three counts: Count I(FMR)—Discrimination on account of race and color under 42 U.S.C. § 1981; Count II(FMR)—Retaliation under 42 U.S.C. § 1981; and Count III (Goulding)—Interference with an advantageous business relationship. In the Amended Complaint, Hall asserts that FMR and Goulding failed to ensure that she received full credit for her work although they "took care that the work of other non-African-American employees was adequately 'captured'"; gave non-African American employees more attractive assignments; subjected Hall to more intense supervision than non-African-American employees; held Hall to stricter attendance rules; and gave preference to non-African-American employees in matters of training, promotions, and compensation. Hall contends that the cumulative mistreatment led to her constructive discharge. After extended discovery, defendants moved for summary judgment on all counts of the Amended Complaint. The court heard oral argument on September 1, 2009.

## DISCUSSION

■ A district court grants summary judgment only "if the pleadings, deposi-

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, this standard compels summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir.2000), quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

■ Where the plaintiff fails to offer direct evidence of discrimination, a district court is to apply a burden-shifting analysis mandated by the Supreme Court. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir.2001). If the plaintiff produces competent evidence establishing prima facie claims of discrimination, the defendant must then articulate "a legitimate, non-discriminatory reason for its adverse employment action" by identifying enough admissible evidence to "support a [rational] finding that unlawful discrimination was not the cause of the employment action." *Id.*, quoting *Hicks*, 509 U.S. at

---

12. The court had dismissed Hall's claim of discrimination based on national origin. Section 1981 allows discrimination claims based on ancestry, but not claims based solely on national origin. *See St. Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987).

507, 113 S.Ct. 2742. If this burden of production is met (which it usually is), the burden of persuasion shifts back to the plaintiff to show that the employer's proffered explanation is a pretext or cover-up for an unlawful discriminatory motive or animus. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Straughn,* 250 F.3d at 34. "At the summary judgment stage, the plaintiff 'must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse decision was a pretext and whether the real reason was discrimination.'"[13] *Quinones v. Buick,* 436 F.3d 284, 289–290 (1st Cir.2006), quoting *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 62 (1st Cir.1999).

### Discrimination under Section 1981

■■ To establish a prima facie case of disparate treatment based on race, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) her employer took an adverse employment action against her; and (4) the position remained open or was filled with someone else with similar qualifications. *See Prescott v. Higgins,* 538 F.3d 32, 40 (1st Cir.2008); *Kosereis v. Rhode Island,* 331 F.3d 207, 212–213 (1st Cir.2003). In her Amended Complaint,

Hall claims that the following acts of discrimination by Goulding took place after November 17, 2003:[14] (1) he required Hall to report to work on time because of her race; (2) he supervised her more intensely than he did her non-African American co-workers; and that he discriminated against her in matters of (3) workplace perquisites; (4) compensation and salary increases; (5) the recording of her work; and (6) her performance evaluation. Amended Complaint ¶¶ 23–27, 29. When she complained to HRS, Hall alleges that Goulding (and others) retaliated against her. *Id.* at ¶ 35. Hall finally alleges that Goulding created a hostile work environment that compelled her to resign involuntarily from FMR. *Id.* at ¶¶ 40–42.

■ None of the allegations bear extended scrutiny. By Hall's own admission, Goulding never disciplined her for absenteeism or tardiness, nor did he ever issue a verbal or written warning. Even if his caution to Hall that Morrissey had observed her arrive late for work on April 15, 2005, amounted to a warning, this would not constitute an adverse employment action under the anti-discrimination laws. *See Wyse v. Summers,* 100 F.Supp.2d 69, 75 (D.Mass.2000) (counseling and warnings regarding tardiness are not adverse employment actions); *Durant v. Nynex,* 101

---

**13.** Section 1981 race discrimination claims are analyzed using the same framework and principles as those used in analyzing Title VII cases. *See Conward v. Cambridge Sch. Comm.,* 171 F.3d 12, 18–19 (1st Cir.1999). "There must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Trialworthiness requires not only a 'genuine' issue but also an issue that involves a 'material' fact." *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir. 1995). A material fact is one which has the

"potential to affect the outcome of the suit under applicable law." *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir. 1993). For a fact to be "genuine," the "evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." *Nat'l Amusements, Inc.,* 43 F.3d at 735 (citation omitted).

**14.** The statute of limitations for claims of race discrimination under section 1981 is four years. *Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004).

F.Supp.2d 227, 233 (S.D.N.Y.2000) (same). *See also Sweeney v. West,* 149 F.3d 550, 557 (7th Cir.1998) (a "definition of adverse employment action ... [cannot] include reprimands ... absent some tangible job consequence."). As Hall admits, all of the employees in the Operations Group except her (and for a time a single white employee) were required to report to work at 8:30 a.m. Hall Dep. at 84–85. Moreover, Goulding permitted Hall to retain a flexible work schedule even when he refused a request for a similar accommodation submitted by a white employee.

■ With respect to work assignments, Hall cannot demonstrate that she was materially disadvantaged in comparison to her co-workers. When asked which employees had received preferential assignments, Hall identified Chris Garland, who was asked to coordinate the completion of a large number of client maintenance requests in mid-March 2005;[15] Todd Lindsay, who was given a quasi-supervisory role;[16] and Melissa Bartlett (Hall's alternate), who was asked to analyze and document ESOP practices.[17] SOF at ¶ 278. The undisputed evidence, however, establishes that these extra assignments brought no special benefit to these employ-ees. Lindsay, Garland, and Bartlett did not receive additional compensation, changes of title, or promotions as a result of the assignments. SOF at ¶¶ 188, 190, 192, 194. Moreover, declining to give work to an employee that is not commensurate with the employee's skills or interests is not an adverse employment action.[18] *See Jacob–Mua v. Veneman,* 289 F.3d 517, 522 (8th Cir.2002) ("[C]laims that because of her race [plaintiff] was given work assignments not commensurate with her skills, abilities, and job functions ... [does not] rise to the level of an adverse employment action"); *Nichols v. S. Illinois Univ.—Edwardsville,* 510 F.3d 772, 780–781 (7th Cir.2007) (campus police officers' protest at being made to perform "the boring repetitive and semiskilled work of mere security guards, which involve[s] monitoring hallways and patrolling buildings" did not describe "a materially adverse employment action").

■ With regard to Hall's allegations that she was more closely supervised than her white co-workers, Hall alleges only that Goulding would look in her cubicle to see what she was working on when he

---

15. Goulding testified that he asked Garland to coordinate with other employees to complete a large number of maintenance items because of his availability and because he regularly performed maintenance work. SOF at ¶ 194.

16. Before transferring to the CMOG, Lindsay had served as the acting supervisor on his previous operations team. He continued to perform many of the leadership roles. SOF at ¶ 192. Hall admittedly did not have such supervisory experience, and never expressed an interest to Goulding in becoming a supervisor. *Id.* at ¶ 193.

17. According to Goulding, Bartlett was assigned the ESOP project because she had indicated to Goulding a personal interest in the task. SOF at ¶ 190. Hall by contrast had

made it clear to Goulding that she had no interest in participating in special projects. SOF at ¶ 186.

18. Goulding did assign Hall to special projects. In August of 2004, Goulding asked Hall to provide an overview of the ESOP process to be included in a CMOG policies and procedures manual. In November of 2004, Goulding gave Hall the task of analyzing how certain ESOP transactions should be handled in XTRAC. In February of 2005, Goulding asked Hall (as a senior member of the Operations Group) to do a quality control check on the work of other employees. Also in February of 2005, Goulding assigned Hall to complete an ESOP gap analysis in connection with NFS's acquisition of another financial company. SOF at ¶ 189.

passed through her work area.[19] Hall also states that Goulding sent her email reminders to fill out her time sheets and complete her E–Time entries, but claims—without any evidence—that he did not send similar reminders to other employees. SOF at ¶¶ 285–286. The record establishes that Goulding routinely sent email reminders regarding E–Time and timesheets to the members of the Operations Group. SOF at ¶ 287. Moreover, it is extremely doubtful that close supervision of an employee constitutes an adverse employment action as a matter of law. *See Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 25 (1st Cir.2002) (supervisors' "extreme" oversight of plaintiff was not an adverse action); *Slater v. Town of Exeter*, 2009 WL 737112, at *5 (D.N.H. March 20, 2009) (requiring plaintiff to account for her time by using a time clock was not an adverse employment action).

As for Hall's compensation complaints, during the time that she reported to Goulding, she was regularly awarded semi-annual bonuses and merit salary increases. SOF at ¶¶ 96, 214, 215, 309. Hall, again without evidence, alleges that white co-workers (Todd Lindsay, Megan Celani, Dmitry Luchinin, and William Scarborough) were better compensated than she was. SOF at ¶ 281. But the record establishes that Hall's salary exceeded the second most highly compensated employee in the Operations Group by approximately $10,000. SOF at ¶¶ 34, 74–78.

Hall's next complaint, that Goulding failed to ensure that all of her work was recorded, does not as a matter of law constitute an adverse employment action. FMR had a valid, non-discriminatory reason for insisting that employees take personal responsibility for keeping track of

their own work. XTRAC and E–Time were tools implemented for a legitimate business purpose—to permit management to monitor employee productivity and work quality, and to accurately price the cost of processing client transactions. SOF at ¶¶ 54, 61, 63. Hall has produced no evidence that white employees were treated any differently with regard to the recording of work. Goulding states—without meaningful contradiction—that all employees in his Group were responsible for entering their work in XTRAC and E–Time.

▪ Hall finally alleges that Goulding subjected her to differential treatment based on her race by giving her an "unfair" performance evaluation in July 2005. She offers no evidence that the evaluation was in fact unwarranted or that she suffered any adverse employment action as a result. Her rating as *Proficient* (and at times exceeding expectations) had no negative impact on her bonus or compensation. SOF at ¶¶ 198, 205. Goulding indeed lauded certain of Hall's accomplishments. SOF at ¶ 206. While Hall also received come criticism, objective statements about an employee's shortcomings or need for improvement do not, by themselves, constitute an adverse employment action. SOF ¶ 207. *See Menchaca v. Ottenwalder*, 18 Fed.Appx. 508, 509 (9th Cir.2001) (an unsatisfactory performance evaluation is not by itself an adverse employment action); *Sweeney*, 149 F.3d at 556 ("This circuit already has concluded that negative performance evaluations, standing alone, cannot constitute an adverse employment action."); *Castro-Medina v. Procter & Gamble Commercial Co.*, 565 F.Supp.2d 343, 371–372 (D.P.R. 2008) (same, negative comments in a performance review were not actionable).

---

**19.** Hall admitted that it was possible that Goulding also looked at what other employees were working on when he passed by their desks, but that she did not "see it . . . and felt that it never happened." Hall Dep. at 245–246.

*Cf. Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir. 1998) ("[A]dmonition that [employee] complete his work within an eight hour period 'or else' does not constitute an adverse action.").

*Hostile Environment*

 The elements of a hostile racial environment claim under Section 1981 are identical to those under Title VII. A plaintiff must establish: (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on her race; (4) that the harassment was sufficiently severe or pervasive so as to alter the terms or conditions of her employment; (5) that the conduct complained of was both objectively and subjectively offensive; and (6) that some basis for employer liability has been established. *Prescott,* 538 F.3d at 41. *See also Brown v. Hot, Sexy and Safer Prod., Inc.,* 68 F.3d 525, 540 (1st Cir.1995).

> [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.... [W]hile psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris v. Forklift Sys.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

 Hall alleges that Goulding created a hostile racial work environment by: (1) watching her throughout the day to monitor when she came in and when she was leaving; (2) sending her email reminders about completing her E–Time entries; (3) telling her that he would discuss her flexible work schedule request in private rather than openly in a group meeting; (4) choosing other employees to do special work projects; (5) asking her to work on the March 2005 maintenance project when he knew she was occupied with other projects; (6) frowning at her; (7) "sneaking up" on her to see if she was working; (8) sitting sideways in a one-on-one meeting rather than looking directly at her; and (9) telling her that he did not know what she was talking about when she told him that she hoped that his relationship with Azzi would not affect his ability to treat her fairly. Hall Dep. at 350–362.

There are two problems with this now familiar litany of complaints. In a hostile environment context, the conduct objected to must be viewed both from a subjective and an objective perspective. If conduct is not so severe or pervasive that a reasonable person would find it hostile or abusive, no section 1981 (or Title VII) right is implicated. *Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. To an objective observer familiar with the daily workplace interactions that occur between supervisors and their employees, as well as the clashes of personality that are the predictable byproducts of the human condition, Hall's complaints would appear for the most part unremarkable or even trivial. "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Bishop v. Bell Atl. Co.,* 299 F.3d 53, 58–59 (1st Cir.2002), quoting *Blackie v. Maine,* 75 F.3d 716, 725 (1st Cir.1996). *See also Conto v. Concord Hosp., Inc.,* 265 F.3d 79, 81 (1 st Cir.2001) (affirming grant of summary judgment on hostile work environment claim where plaintiff did not show that defendant's conduct unreasonably in-

terfered with her work performance); *McKenzie v. Potter*, 2004 WL 1932766, at *7 (D.Mass. Aug. 20, 2004) (plaintiff's conclusory allegations that harassing conduct was gender-based were insufficient to withstand summary judgment). Second, and equally telling, is the absence of evidence that any of the perceived slights on Goulding's part had a connection to Hall's race (or gender).

*Constructive Discharge*

▆▆▆ In a wrongful termination case, a plaintiff

> must first establish a prima facie case, that is: (1) that she was within a protected class; (2) that she met the employer's legitimate performance expectations; (3) that she was actually or constructively discharged; and (4) that she was replaced by another employee with similar skills and qualifications. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Alleging constructive discharge presents a "special wrinkle" that amounts to an additional prima facie element. In such cases, the plaintiff must prove that [her] employer imposed "working conditions so intolerable [ ] that a reasonable person would feel compelled to forsake [her] job rather than to submit to looming indignities."

*See Landrau–Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 612–613 (1st Cir.2000). "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." *Blackie*, 75 F.3d at 725–726. A construc-

tive discharge may also occur when an employer effectively prevents an employee from performing her job. *Sanchez v. Puerto Rico Oil Co.*, 37 F.3d 712, 719 (1st Cir.1994).

▆▆▆ To prove constructive discharge, a plaintiff must offer evidence of harassment at least as severe (if not more) than that required for a hostile work environment claim. *See Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."), cited in *Hernandez–Torres*, 158 F.3d at 48. Petty annoyances, minor workplace indignities, and hurt feelings do not make out a constructive discharge claim—"It is not enough that a plaintiff suffered the 'ordinary slings and arrows that workers routinely encounter in a hard, cold world.'" *Lee–Crespo v. Schering–Plough Del Caribe, Inc.*, 354 F.3d 34, 45 (1st Cir.2003), quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir.2000) ("[E]xclusion from operational meetings, relocating staff, relegating plaintiff to developing third-party clients ... does not furnish a legally cognizable reason to treat a resignation as a constructive discharge."); *Serrano–Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23, 27 (1st Cir.1997) (injury to pride resulting from the loss of a promotion); *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34, 653 N.E.2d 161 (1995) (unfavorable performance review or a one-time demotion). *Compare Aviles–Martinez v. Monroig*, 963 F.2d 2, 6 (1st Cir.1992) (finding constructive discharge when an employer, inter alia, "removed all of [plaintiff's] files and then chastised him for not doing his work"); *Parrett v. City of Connersville, Indiana*, 737 F.2d 690, 694 (7th Cir.1984) (finding constructive discharge where su-

pervisor stripped employee of all work and responsibilities).

*Retaliation*

▇▇▇▇ To make out a prima facie case of retaliation, Hall must show that: (1) she engaged in a protected activity; (2) she suffered some materially adverse action; and (3) the adverse action was causally linked to her protected activity. *See Prescott*, 538 F.3d at 43. "The alleged retaliatory action must be material, producing a significant, not trivial, harm. Trivial actions such as 'petty slights, minor annoyances, and simple lack of good manners will not [normally] create such deterrence.'" *Carmona–Rivera v. Puerto Rico*, 464 F.3d 14, 20 (1st Cir.2006) (internal citations omitted). "Materially adverse" means the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C.Cir. 2006). The test for whether an adverse action is material or produces significant harm is "objective." *Id.* at 69–70, 126 S.Ct. 2405.

Hall alleges that after she complained about her performance review in late July of 2005, Goulding (and to a lesser extent, Mincone) punished her for doing so. SOF at ¶¶ 308, 312. According to Hall, Goulding frowned at her more often; did not speak to her as much; continued to sit sideways in private meetings with her; and failed to acknowledge her when clients praised her work. SOF at ¶ 311. Hall, however, concedes that Goulding never

disciplined her during this period,[20] did not demean her, did not decrease her salary, did not discontinue her flexible work schedule, and gave her a bonus and a promotion. SOF at ¶ 309.[21]

▇▇▇▇ Retaliation claims proceed under the *McDonnell Douglas* framework. *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 81 & n. 4 (1st Cir.2007). To establish liability, a plaintiff must show: (1) that she engaged in protected conduct; (2) that she was subjected to an adverse employment action; and (3) that there was a causal connection between the first and second elements. *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85 (1st Cir.2006). An employment action to be adverse "must materially change the conditions of plaintiff's employ." *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir.2002). Moreover, the harm must be sufficient to dissuade a reasonable worker from making or supporting a charge of discrimination. *Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405; *Mariani–Colon v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 223 (1st Cir.2007).

▇▇▇▇ Hall's retaliation claim suffers from the same two defects as her hostile environment claim. First, the retaliatory acts alleged by Hall do not amount to "materially adverse" actions, but are instead the kinds of petty slights and minor annoyances that the anti-discrimination laws are not intended to address. *See Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405. Second, Hall has failed to demonstrate a causal connection between protected activity and any alleged retaliatory conduct on the part of Goulding or Mincone. At her deposition, Hall testified that she

---

**20.** Goulding left the Operations Group in September of 2005 to take a supervisor's job in another unit of FMR.

**21.** Hall claims that Mincone retaliated against her by not saying hello when she stopped by his work unit (which was in another area of the office), and by not introducing her to client visitors. SOF at ¶ 316.

"thought" that the first time Goulding may have become aware of her discrimination complaints was at a meeting that he attended with Mincone in early September of 2005 (Hall was not present at the meeting).[22] SOF at ¶ 249. As previously noted, Goulding left the Operations Group almost immediately after the meeting.[23] *See Pomales v. Celulares Telefonica, Inc.*, 447 F.3d 79, 85 (1st Cir.2006) (affirming dismissal of a retaliation claim where the alleged retaliator was not aware that plaintiff had engaged in protected activity).

### *Interference with Advantageous Business Relationship*

Tortious interference with advantageous (business) relations requires that a plaintiff prove four elements: "(1) the existence of a contract or business relationship; (2) the defendants' knowledge of the contract or business relationship; (3) the defendants' intentional interference with the contract or business relationship for an improper purpose or by an improper means; and (4) damages." *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 397, 668 N.E.2d 333 (1996), citing *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 815–817, 551 N.E.2d 20 (1990). "[S]omething more than intentional interference is required" to make out the tort. *Id.* at 815, 551 N.E.2d 20, adopting *Restatement (Second) of Torts*, § 766 (1977) (replacing the term "malicious" with "improper"). *See W. Oliver Tripp Co. v. Am. Hoechst Corp.*, 34 Mass.App.Ct. 744, 751–752, 616 N.E.2d 118 (1993) (same). *Compare King v. Driscoll*, 418 Mass. 576, 587, 638 N.E.2d 488 (1994) (where a corporate official is named as a defendant, the tort requires "actual malice" or "a spiteful, malignant purpose, unrelated to the legitimate corporate interest," motivations of personal gain or dislike are not enough); *Blackstone v. Cashman*, 448 Mass. 255, 261, 860 N.E.2d 7 (2007) (corporate officials are held to a standard of actual malice because their "freedom of action" with respect to corporate interests should not be restrained by "a fear of personal liability").

The actual malice standard is a heightened burden placed on plaintiff and not a defense to be proved by the defendant. *Id.* at 261 n. 10, 860 N.E.2d 7. Where a supervisor's motives are mixed the plaintiff has the burden of proving that his actions "were unrelated to any legitimate corporate interest." *Clement v. Rev-Lyn Contracting Co.*, 40 Mass.App.Ct. 322, 325, 663 N.E.2d 1235 (1996) (by lowering the threshold of malignant purpose to one of mere unreasonableness, the trial judge improperly diminished the plaintiff's burden of proof). The term "corporate official" is to be interpreted expansively in the context of the tort to include company officers and outside directors. *Blackstone*, 448 Mass. at 266–267, 860 N.E.2d 7. The actual malice standard applies uniformly to both motive and means. *Id.* at 269 & n. 18, 860 N.E.2d 7 (motive and means are subsumed in the "more stringent analysis implied by actual malice in contrast to cases not involving corporate officers").

Hall's tortious interference claim fails on two separate grounds. The first is the lack of causation. Hall resigned from her employment *after* Goulding trans-

---

**22.** Goulding and Mincone state that they only became aware of Hall's allegations when her attorney sent a demand letter on her behalf to FMR in April of 2006—six months after her resignation. SOF at ¶¶ 255–256.

**23.** Moreover, objecting to a performance review as unfair is not ordinarily regarded as "protected activity." *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701–702 (3d Cir.1995).

ferred to another unit of FMR and was no longer her supervisor. *See Sklar v. Beth Israel Deaconess Med. Ctr.*, 59 Mass.App. Ct. 550, 556 n. 9, 797 N.E.2d 381 (2003). Second, the tort requires a showing that a supervisor's conduct was unrelated to any legitimate corporate interest of the employer, *Shea v. Emmanuel Coll.*, 425 Mass. 761, 764–765, 682 N.E.2d 1348 (1997), and that malice was the "controlling factor" in the alleged interference. *Weber v. Cmty. Teamwork, Inc.*, 434 Mass. 761, 783, 752 N.E.2d 700 (2001) (emphasis added). It is difficult to imagine the scenario in which a supervisor's insistence that an employee arrive for work on time, that she comply with the rules and procedures governing the transaction of office business, and that she do her fair share of the office's work, could not be said to further an employer's legitimate interests.

### ORDER

For the foregoing reasons, defendants' motion for summary judgment as to Counts I, II, and III of the Amended Complaint is *ALLOWED*. The Clerk will enter judgment for defendants and close the case.

SO ORDERED.